JUDSON J. DIKEMAN AND ORVILLE DOUGHERTY v. OTIS
ARNOLD.[1]

*Deed—Delivery—Escrow— Husband and wife—Mortgage— Home-
stead—Land contract—Damages—Charge to jury.*

1. Whether a deed has been delivered so as to pass title depends.
   upon the intention of the parties.
2. It is competent for a grantor to show by parol that a deed
   which he had executed and acknowledged was not to be·
   delivered until the happening of certain contingencies, or that
   it was left in escrow until the happening of some subsequent·
   event, and a delivery contrary to such an agreement is not.
   binding upon him.
3. A party has the right to have his theory of the case submitted
   to the jury, if supported by testimony, with proper instructions.
   in relation to the law in case they find the testimony pre-
   ponderates in favor of such theory.
4. A husband cannot mortgage land for which he exchanges his·
   homestead, and which is to be occupied in lieu thereof as a
   homestead, to secure a loan from a third party with which to·
   pay the difference agreed to be paid on such exchange, without
   his wife's signature to the mortgage.
5. The wife's homestead rights will be protected in whatever form.
   they may come in question, whether at law or in chancery.
6. An instruction that, if a given state of facts is found by the jury,
   the plaintiff is entitled to a verdict, but which ignores the theory
   of the defendant, which his testimony tends to support, and
   which is a complete defense if accepted by the jury, is erro--
   neous.
7. Under a land contract stipulating for a good and sufficient deed·
   the grantee has a right to a good title, and one not clouded or·
   incumbered by an outstanding life-estate in a portion of the·
   land conveyed.
8. In *Allen v. Atkinson,* 21 Mich. 361, it was held that the vendee·
   had an undoubted right to a good title, and to a deed with
   proper covenants; and he had a right also to insist that the
   title should be a marketable one, not open to reasonable objec--
   tion.

[1] For a second report of this case, see 44 N. W. Rep. 407.

9. The measure of aamages for a willful refusal by the defendant to convey land agreed to be received by the plaintiff on an exchange of farms. as *part* payment for the farm deeded by him to the defendanv, is the fair, market value of the defendant's farm at time of the breach.

Error to St. Joseph. (Loveridge, J.) Argued June 19, 1888. Decided October 19, 1888.

*Assumpsit.* Defendant brings error. Reversed. The facts are stated in the opinion.

*O. F. Bean* and *Howard & Roos,* for appellant, contended:

1. There can be no delivery and acceptance of a deed unless the minds of both grantor and grantee meet in such delivery and acceptance; citing Mart. Conv. § 206, and cases cited.
2. To have the effect of a delivery so as to give force to a deed, it must have been completely executed; citing 3 Washf. Real Prop. (4th ed.) 286; Mart. Conv. §§ 206, 220; 1 Dev. Deeds, § 310; *Steel v. Miller,* 40 Iowa, 402; *Stiles v. Probst,* 69 Ill. 382; *Williams v. Sprigg,* 6 Ohio St. 585; *Parker v. Parker,* 1 Gray, 409; *Overman v. Kerr,* 17 Iowa, 485; and to the same effect in principle is *Pierson v. Spaulding,* 61 Mich. 90.
3. There can be but one delivery of the same deed, and' that only after it is fully completed; citing *Stiles v. Probst,* 69 Ill. 382; *Parker v. Parker,* 1 Gray, 409; *Overman v. Kerr,* 17 Iowa, 485.

*Howell, Carr & Barnard* and *Dallas Boudeman,* for plaintiffs, contended:

1. No legal impediment existed to the delivery of plaintiffs' deed on June 16, 1887, without the signature of Mrs. Orville Dougherty, which deed passed the legal title, and was accepted by defendant relying upon the agreement of a third person to procure her inchoate dower, which he had a right to do; citing *Brooks v. Isbell,* 22 Ark. 488; *Travis v. Tyler,* 7 Gray, 147; *Brittain v. Work,* 13 Neb. 347; 1 Dev. Deeds, § 306; *Towery v. Henderson,* 60 Tex. 291.
2. A party may make a complete execution and delivery of a deed as to himself, whether the others sign or not; citing *Gilmore v. Morris,* 13 Mo. App. 114; *Colton v. Seavey,* 22 Cal. 496; *Tustin v. Faught,* 23 Id. 237; *Jackson v. Stanford,* 19 Ga. 14.

71 Mich—42.

3. The question of delivery and acceptance is one of intent, which should be submitted to and decided by the jury; citing 1 Dev. Deeds, §§ 262, 308; *Rivard v. Walker*, 39 Ill. 413; *Ruckman v. Ruckman*, 32 N. J. Eq. 259; *McCullough v. Day*, 45 Mich. 554; *Parker v. Dustin*, 22 N. H. 424; *Ela v. Kimball*, 30 Id. 127; *Warren v. Swett*, 31 Id. 332; *Hurlburt v. Wheeler*, 40 Id. 73.

4. The defendant is estopped from claiming that the title did not pass to him through this deed, as the other parties acted on his acceptance of it as it was, without which acceptance the transfer from plaintiffs to the Shaws would not have been made. He is also estopped by giving the $5,000 note to borrow the money to pay upon the purchase, and by the execution and delivery of the mortgage, which he could not legally do without such acceptance, of which fact he was advised.

5. The intention as to delivery and acceptance should be determined by what had occurred, and by the surrounding circumstances, as in other cases; citing *French v. Carhart*, 1 N. Y. 96; *Fellows v. Fellows*, 37 N. H. 75; 1 Dev. Deeds, § 263.

6. The rule that parol evidence is admissible to explain and apply a writing is universal in its application; citing *Emery v. Webster*, 42 Me. 204; *Barnebe v. Suaer*, 18 La. Ann. 148; *Pierson v. Bank*, 77 N. Y. 309; *Spencer v. Babcock*, 22 Barb. 326; *Reader v. Helms*, 57 Ala. 440; *Keough v. McNitt*, 6 Minn. 513.

7. Pre-existing and contemporaneous facts and circumstances attending the negotiations of the parties in making the contract may be shown; citing *Pierson v. Bank*, 77 N. Y. 309; *Barnebe v. Suaer*, 18 La. Ann. 148; *Reader v. Helms*, 57 Ala. 440; *Sigerson v. Cushing*, 14 Wis. 526.

8. The surrounding circumstances, and subsequent conduct and acts of the parties, are material and competent to show the interpretation which they put on the agreement; citing *Knight v. Worsted Co.*, 2 Cush. 283; *Pierson v. Bank*, 77 N. Y. 309; *Acker v. Bender*, 33 Ala. 230; *Cross v. Pearson*, 17 Ind. 612; *Emery v. Webster*, 42 Me. 204; *Grant v. Lathrop*, 23 N. H. 67; *Haldeman v. Chambers*, 19 Tex. 1; *Conner v. Carpenter*, 28 Vt. 237; *Ratcliffe v. Allison*, 3 Rand. (Va.) 537; *Sigerson v. Cushing*, 14 Wis. 527.

CHAMPLIN, J. On June 16, 1887, the plaintiffs were the owners of a farm of 210 acres in Sherwood, Branch county, upon which Richard Dougherty, the father of Orville, and the father-in-law of Dikeman, held a mortgage of a little over $7,000.

Jasper Shaw and Elsie, his wife, owned two farms,—
one of 124½ acres, near Three Rivers, Mich., and the
other in Indiana.

The defendant was the owner of a farm adjoining the
Shaw farm, near Three Rivers, and was also the owner of
several lots in the village of Three Rivers. Upon this
farm were good houses and barns, and he had resided
thereon with his wife and family several years.

The plaintiff Dikeman resided in Three Rivers, where he
carried on a bakery and ice-cream parlors.

Orville Dougherty, with his family, resided upon the
farm in Branch county, and the Shaws resided upon their
farm near Three Rivers.

The plaintiffs were desirous of making some disposition
of their farm in Branch county, whereby they could
reduce their indebtedness, and had talked of trading farms
with Shaw, who informed them that defendant had been
desirous of purchasing about 40 acres from him. They
thereupon called upon defendant to learn if he would
purchase a part of the Shaw farm in case they should
trade with Shaw. They found that he was not anxious
to purchase, but had talked with Shaw about it some-
time previous. He suggested, however, that he might take
the whole of the Shaw farm if he could trade his village
lots and some other land for it. They returned the next
day, when a more definite proposition was made. This
was on June 11, and was embodied in the following
writing:

"THREE RIVERS, MICH., June 11, 1887.
"Agreement between Otis Arnold and son, party of the
first part, and Dougherty and Dikeman, party of the
second part.

"We, the party of the first part, agree to sell to the
party of the second part 25 acres for $6,000, which will
include all buildings and Arnold's house, and all build-
ings of whatsoever nature, except one barn, which must

be moved to the Shaw farm by the party of the second part, where the party of the first part designates. The party of the first part also agrees to sell all the balance of land east of the hedge fence for $100 per acre. The party of the first part also agrees to buy of the party of the second part the Shaw farm at $13,000, in exchange for the above-described property. The party of the second part agrees to take said property of Arnold in exchange for the 'Shaw farm' by June 16, 1887.

" [Signed]        OTIS ARNOLD AND SON.

"DOUGHERTY AND DIKEMAN."

It was claimed on the part of the plaintiffs that Mrs. Arnold, wife of Otis Arnold, was cognizant of the trade which was being talked up with her husband, and assented thereto. On the other hand, defendant claims that Mrs. Arnold objected to the trade, and distinctly told plaintiffs that she would not assent thereto. Testimony was introduced in support of the claims made. On the evening of June 15, plaintiffs informed defendant that they were ready to carry out the trade the next day. The defendant claims that Mrs. Arnold again told them she was opposed to the trade, and would not consent to it; and they then said to her that, if she did not want the trade to go any further, it should go no further. This is disputed by plaintiffs.

On the morning of the 16th, Dikeman again went to Arnold's, and told him that they were ready to draw the papers. The plaintiffs, defendant, Shaw and his wife, and Richard Dougherty, met at the law-office of Newton H. Barnard, of the law firm of Howell, Carr & Barnard, to have the papers drawn. There is considerable conflict in the testimony as to what took place on this occasion. All agree, however, that Mr. Barnard drew up the following papers, viz.:

A deed from plaintiffs and their wives to Jasper Shaw of an undivided half of their farm in Branch county ; a like deed of the other undivided half to Mrs. Shaw; a

deed from Mrs. Shaw to plaintiffs of the Shaw farm; a deed from Mr. Shaw to Dikeman of the land in Indiana; a deed from Mr. and Mrs. Dikeman and Mr. and Mrs. Dougherty to Otis Arnold of the Shaw farm; a discharge of the mortgage held by Richard Dougherty on the Branch county farm; a mortgage from Otis Arnold and his wife to Richard Dougherty for $5,000 on the Shaw farm, and notes secured thereby to that amount; and a contract between Otis Arnold and plaintiffs.

Certain abstracts were produced, and there is no dispute that Mr. Arnold took the abstract of the Shaw farm to his attorney, Mr. Bean, for his examination and advice. What was said and done on his return is controverted.

The plaintiffs claim that defendant announced that he was satisfied with the abstract of title, and that all parties were anxious to close up the transaction; that the deeds from the plaintiffs to the Shaws of the Branch county farm were duly executed, delivered, and accepted; but such deeds lacked the signature of Mrs. Dougherty, who was not present, but was at home on the farm, and the question came up, what should be done under the circumstances?

That defendant had arranged with Richard Dougherty to borrow $5,000 from him on the Shaw farm, that being the amount he was to pay plaintiffs on this purchase, and Richard Dougherty refused to discharge his mortgage on the Branch county farm until he had got from Mr. Arnold the notes and mortgage on the Shaw farm which he was to receive.

That Barnard stated to the parties that, in order for Mr. Arnold to execute the notes and mortgage to Mr. Dougherty on the Shaw farm, it was necessary that the defendant first accept the deed made to him by the plaintiffs.

That defendant then took the deed, and looked it over,

and said it was all right, except Mrs. Dougherty had not signed it, and then asked Richard Dougherty if he would become responsible for the execution of the deed by Mrs. Orville Dougherty, provided he (defendant) would accept the deed in the condition it then was; that Richard Dougherty ·said he would become responsible that she should sign the deed; that he would take it himself to her, and have her sign it, and send it back, and that he would become responsible for her signing it; that defendant then said he would accept the deed as it was, and told Mr. Dougherty to leave the deed after obtaining such signature at Mr. Barnard's office for him.

That defendant then executed three notes, which were drawn by his direction, aggregating $5,000, and then delivered them to Mr. Dougherty; and also executed a mortgage upon the Shaw farm to secure the payment of such notes, and delivered that to Richard Dougherty.

After that was done it is further claimed by the plaintiffs Mr. Barnard drew a contract, which was duly witnessed, and signed, sealed, and acknowledged by the parties to this suit, and which reads as follows:

"*This agreement,* made this 16th day of June, A. D. 1887, by and between Otis Arnold, of Three Rivers, St. Joseph county, State of Michigan, party of the first part, and Judson J. Dikeman, of Three Rivers, Michigan, and Orville Dougherty, of Sherwood, Michigan, of the second part, *witnesseth:*

"That the party of the first part, for and in consideration of the sum of five thousand seven hundred dollars, to him in hand paid by the transfer to him of the farm known as the 'Shaw Farm,' situated on sections 13 and 24, Fabius township, St. Joseph county, State of Michigan, agrees to sell and convey unto said parties of the second part all of the following described pieces and parcels of real estate, situated, lying, and being in the village of Three Rivers, St. Joseph county, and State of Michigan, to wit: Lots 1, 2, 3, 4, 5, 6, 7, and 8, in block 7; lots 1, 2, 3, 4, 5, and 6, in block 6; lots 5 and 6, in block 4; lots

5 and 6, in block 5; lots 1, 2, 3, and 4, in block 3; all of blocks 8, 9, 10, and 11; all of block 12, excepting lots 5 and 6, in said block; all of block 13, except lots 1 and 2; and all of block 14, except lots 1, 2, 3, 4, 5, and 6, and a narrow strip off the east end of lots 10, 11, and 12, owned by Albert Ackenback;—all in Otis Arnold's addition to the village of Three Rivers, according to the recorded plat thereof, also lots 4, 5, and 6, in block 18 of Yawney's addition to the village of Three Rivers, according to the recorded plat thereof.

"It being expressly understood and agreed by and between the parties hereto that all of said lands shall be surveyed, and that the parties of the second part shall receive the first twenty-five acres for said sum of five thousand seven hundred dollars; and for that all said land shall overrun said amount of twenty-five acres, said parties of the second part shall pay at the rate of one hundred dollars per acre for each and every acre which the same shall overrun; and that in surveying and measuring said land the same shall be surveyed and measured to the center of all streets and highways adjoining the same.

"Also that he will sell and convey to said parties of the second part a string of land extending in width from the township line between Lockport and Fabius townships, west to a hedge fence running north and south, parallel with said section, supposed to be about twenty rods in width, and extending from the section-line highway on the south to six North street on the north.

"And it is expressly understood and agreed by and between said parties that the parties of the second part shall pay to said party of the first part the sum of one hundred dollars per acre for all of said above-described land, the same to be credited on the purchase price of the farm this day bought by the party of the first part of the parties of the second part, known as the 'Shaw Farm;' and the parties hereunto expressly agree that a survey shall be made of said land above described at the earliest possible moment, and that as soon as completed said party of the first part shall make, execute, and deliver to said parties of the second part a good and sufficient deed of conveyance (containing full warranties) for all of above-described land, free and clear from all liens and incumbrances whatsoever.

"It is further expressly understood and agreed by and between the parties hereto that the party of the first part

is to reserve the barns on the south end of said last-mentioned land, the same to be removed therefrom to such place as the party of the first shall designate on the Shaw farm.

"Said party of the first part also reserves the tool-house and barracks west of the large house, and the water-tank near the barn; the same to be removed by him therefrom.

"The party of the first part is to remove the fence, now west of the proposed division line, onto the line; and that afterwards each one of the parties is to keep up one-half of said division fence,—the party of the first part to keep up the north end or half, and the parties of the second to keep up the south half, of said line fence.

"Party of the first part assumes the contract now due from Jasper N. Shaw relative to the hedge now growing upon the farm transferred to him this day by Judson J. Dikeman and Orville Dougherty, he agreeing to hold said Shaw and all other parties harmless by reason thereof, and to settle with the Dayton Hedge Company therefor.

"The party of the first is to prepare the foundation for the barns to be moved by the parties of the second part, and to remove the stone from the foundation of said barns so to be removed, at his own expense.

"In testimony whereof the parties have hereunto set their hands and seals at Three Rivers, Michigan, the 16th day of June, A. D. 1887, aforesaid."

Plaintiffs claim that the reason why a deed from Arnold to plaintiffs was not drawn and executed at the time was that the quantity of land was not known, and it required a survey to ascertain the quantity and aggregate value at the agreed price.

That after the papers were all executed Richard Dougherty said he might want to sell the mortgage, and he thought it might sell better if it was executed by Mrs. Arnold. A notary and witness were then sent over to get the signature and take the acknowledgment of Mrs. Arnold to the mortgage, but she absolutely refused to sign the mortgage.

The next day the Shaws commenced to remove to the farm in Branch county, and towards evening Dikeman

took a load of household goods to Arnold's, but was refused permission to leave them; and Arnold refused to do anything further about carrying out the contract.

The above is the transaction as the plaintiffs claim it to have occurred.

The defendant claims that he told Mr. Dikeman that he wanted his own attorney, Mr. Bean, to draw his papers, and to look over the abstract of the Shaw farm, and the will through which Mrs. Shaw claimed, and that if everything was right he would *not* then sign any papers until his wife agreed to the trade.

That the plaintiffs gave him a partial abstract of the Shaw farm, which he took to Mr. Bean's office for him to examine, and was told by Mr. Bean that the abstract was not down to date, and was imperfect in other particulars; that he (Bean) was just going away to a funeral, and could not look after the matter that day, but would look after it when the abstract was completed.

That when he went back he met Mr. Dikeman on the stairs leading to Barnard's office, and told him what Bean said, and then told him that he would accept no title until Mr. Bean had looked over the completed abstract, and all the papers, and pronounced them correct; and Dikeman replied, that was all right; they would get a complete abstract, and Mr. Bean should pass upon it, and upon the papers, but the papers could be drawn that day, and be left with Barnard for Bean's inspection; and they went on and drew the papers.

That when George Arnold, the son of defendant, who was present a portion of the time, went home to dinner, he found his mother unalterably opposed to the trade; and when he came back to Barnard's office he testifies that he so told Orville Dougherty, and that Dougherty said they would get the papers ready to sign, and if she would not sign, that would end it.

That when the papers were drawn Mr. Barnard suggested it would be well for those present to sign, and that it would save their coming again; that then the deed from plaintiffs to defendant could be sent to the wife of Orville Dougherty to sign and acknowledge, and they could go to Mr. Arnold's house, and have his wife sign and acknowledge the mortgage; and, when the deed came back from Mrs. Dougherty, Bean could examine the abstract, and all papers, and if everything was correct they could then be delivered; and the papers were thereupon signed.

The defendant further claims that he never acknowledged the mortgage, but that his and his wife's names were both written in the same acknowledgment, and it was understood that the acknowledgment should be joint; that, after the papers were signed, Mr. Dikeman, Mr. Arnold, and a notary went together to Mr. Arnold's house, to have her sign the mortgage, and jointly acknowledge the same; that Mrs. Arnold absolutely refused to sign, and the notary and Mr. Dikeman went away, and took the mortgage with them; and that the trade thereupon fell through.

On June 18 the deed from Shaw to plaintiffs and the mortgage from Arnold to Richard Dougherty were left for record by Mr. Dikeman. The reasons given by Mr. Dikeman for recording these instruments were that he—

"Had heard on the streets of Three Rivers that Otis Arnold was not worth a cent, and you could not collect a dollar of him; and another reason why I wanted to have the papers recorded was, Richard Dougherty wanted I should have his mortgage recorded."

The discharge of mortgage was placed upon record on June 20.

After the deed was signed and acknowledged by Mrs. Dougherty, plaintiffs tendered it to defendant, and he declined to accept it, and declined to have a survey made

of the land mentioned in the contract. The plaintiffs caused a survey to be made, from which they found an excess of quantity which, at the price named in the contract, amounted to $711. This they tendered to defendant, and he refused to accept it; and also tendered a deed, and requested him to execute the same, which he declined to do.

This action was brought to recover the value of the land which defendant refused to convey. The theory of the plaintiffs was that they had sold and conveyed to defendant the Shaw farm for $13,000, to be paid for by defendant, $5,000 down, which was arranged for by the giving of the notes and mortgage to Richard Dougherty in payment of so much indebtedness to him from them, and the balance of $8,000 to be paid by a conveyance of certain land at an agreed price, and certain other land, the exact quantity of which was unknown, at an agreed price per acre; and if there should be an excess in quantity, so that the aggregate price would exceed $8,000, they should pay for such excess at the rate of $100 per acre; and that in this action they were entitled to recover what said land was reasonably worth, less the $711 excess at the agreed price.

The defendant's theory was that his agreement to exchange farms was conditional upon his wife's assent, and upon the examination and approval by his attorney of the abstract of title and the papers; that the papers were not complete, and were not executed for immediate delivery, but were to be left with Mr. Barnard until such examination could be had and assent of his wife obtained; that they were delivered without authority, and after plaintiffs were informed that his wife would not consent, and before any examination or approval by his attorney of the abstract or papers, and that he was under no obligation to execute a deed.

But the agreement was reduced to writing, and was signed by him, and it contains no conditions respecting the obtaining the wife's signature or assent, or the examination and approval by his attorney; and the agreement so reduced to writing and signed cannot be varied or modified by parol testimony. It was competent, however, for defendant to show by parol that the papers were not to be delivered until certain contingencies should happen, or that they were left in escrow until some subsequent event should occur, and delivery contrary to such agreement would not be binding upon the party.

I think the defendant's fifth and eighth request should have been given, viz.:

"5. The question of delivery of a deed is always one of intention of the parties. In all cases the intention that the deed shall be delivered and become effective must exist, and therefore it is essential that the deed be understood by the parties to be completed and ready for delivery in order to have the mere placing of it in the hands of a grantee to be construed into a delivery."

"8. If the jury find that it was the understanding of the parties that the abstract was to be brought down to date, and that Mr. Bean was to have an opportunity to examine the abstract and other papers, before title passed, then the bargain could not be considered completed until this had taken place, and the plaintiffs, if the jury so find the facts to be, cannot recover in this suit."

This was the defendant's theory of the case which he asked to have submitted to the jury. There was testimony to support it, and it was proper for the jury to pass upon it. The court, however, did not submit this theory of the defendant to the jury, and instruct them in relation to the law in case they found the testimony preponderated in favor of such theory, but contented himself by merely stating that—

"The defendant on his part claims that the execution of the deed of the Shaw farm was not complete on the 16th day of June, because it was not signed by the wife

of Orville Dougherty, and that the deed was not delivered to him, and that he was not to accept and take the deed until it should be executed by the wife of Orville Dougherty, nor until the abstract of title to the Shaw farm should be examined by his attorney, and declared to be correct."

He nowhere states what the law is, or what their verdict should be, if they found defendant's claim sustained by the weight of evidence, but immediately proceeds to present the case to them under the plaintiffs' theory; and, after instructing them that whether the deed of the Shaw farm was delivered and accepted was a question of fact for them, he instructs them that the delivery of the mortgage and notes is important only as it bears upon the question of the delivery of the deed; that the signing of the mortgage by the wife of Mr. Arnold, the defendant, was not essential to its validity, whether it was or was not given for purchase money.

The transaction between the plaintiffs and defendant involved all that was contemplated and necessary to accomplish the result, and it is proper to regard it as a whole in order to determine whether it was a binding agreement between the parties. It included the exchange of farms between the plaintiffs and Mrs. and Mr. Shaw, the discharge of the mortgage held by Richard Dougherty, the exchange of land between plaintiffs and defendant after they had acquired the title to the Shaw farm, and the incumbering of the Shaw farm by defendant for $5,000. Each step in the progress towards the result was therefore material.

Failure to carry out the arrangements between any of the parties necessarily terminated the agreement between the plaintiffs and defendant, which, stripped of unnecessary verbiage, was an agreement to exchange a portion of defendant's farm, including his homestead, valued at a certain price, for the Shaw farm, valued at $13,000, and

pay the difference in money. It was the exchange of one homestead for another; and the husband, before the exchange was completed, could no more mortgage the homestead he was to receive in exchange, without his wife's consent and signature, than he could do so after the transaction was completed. If this could be done, then the wife's interest in the homestead could be mortgaged without the wife's consent or signature simply by calling it a purchase-money mortgage, and the wife deprived of her homestead interest through the machinations of her husband and a third party.

This appears in a still stronger light upon plaintiffs' theory, which was that Mrs. Arnold knew of the contemplated exchange, and consented thereto. She then must have contemplated that she and her husband were to receive the Shaw farm as a homestead to the extent allowed by law in exchange for the one she was relinquishing. But under the evidence she did not know that a mortgage of $5,000 was to be placed on that homestead; for until the parties met on July 16, at Barnard's office, at which meeting she was not present, no mention was ever made of mortgaging the Shaw farm to Richard Dougherty. The first contract, of date June 11, says nothing about a mortgage, or even a payment for a difference in value between the farms. It was an exchange of one property for the other. It is quite a different contract from that drawn in Barnard's office on the 16th of the month. She was neither consulted nor consented to the execution of the mortgage upon her homestead which was to be received in exchange. If the title vested at all in Mr. Arnold, it so vested as his homestead under the facts and circumstances of this case.

The mortgage was executed as a loan to Richard Dougherty, and not as a security to him for a portion of the purchase money. Richard Dougherty conveyed no title

to Mr. Arnold, and he stands in this transaction simply as a creditor loaning money to Mr. Arnold.

The wife's homestead rights will be protected in whatever form they may come in question, whether at law or in chancery. It was error for the court to instruct the jury that—

" The signing of the mortgage by the wife of Mr. Arnold, the defendant, was not essential to its validity, whether it was or was not given for the purchase money."

It is true that the validity of the mortgage was not directly in issue between the parties to the instrument, but it was involved in the theory presented by the respective parties, and had an important bearing upon the theory of the defendant that the papers were incomplete, and not ready for delivery, and were not to be delivered, but were to remain in Mr. Barnard's hands until, among other things, Mrs. Arnold's consent to the arrangement could be obtained

Error is assigned upon the following instruction given to the jury by the court:

" If the jury find that during the negotiations, on June 16, the defendant was told by Richard Dougherty that he (Dougherty) would not discharge his mortgage on the Sherwood farm until he had the notes of the defendant, secured by mortgage on the Shaw farm, which defendant had arranged to give, and the defendant was told by Mr. Barnard that he could not execute a mortgage upon the Shaw farm until he had accepted the deed, and he then did accept the deed, and afterwards executed the notes and mortgage, and signed the contract, then the verdict of the jury must be for the plaintiffs."

The Sherwood farm was the farm owned by plaintiffs, upon which Richard Dougherty held his mortgage.

The fault of this instruction is that the circuit judge ignores the theory of the defendant, which his testimony was introduced to prove, that all this was done with the

express understanding that the papers were to be executed as far as they could be by such of the parties as were present, and were then to be left in Barnard's hands until Mrs. Arnold's consent and signature to the mortgage could be obtained, and until his attorney, Mr. Bean, had examined the papers, and advised him that the title was satisfactory.

If this contention of the defendant was true, then the plaintiffs were not entitled to recover, although defendant, formally accepted the deed, and executed the notes and mortgage under the understanding stated; and in view of defendant's theory of the case, which was not presented to the jury by the court, it was error to charge them that—

"If the jury should find that the defendant said before he signed the contract he wished Mr. Bean to look the papers over, but afterwards changed his mind and executed the contract, it would be just as binding on him as if nothing had been said about Mr. Bean's looking them over."

It was one of the matters of defense that defendant, should be furnished with a complete abstract of the Shaw farm for Mr. Bean to examine, and, if the title was not, perfect, he was not to take it. Defendant claimed and offered to show that such abstract was not furnished bringing the state of the title down to the date of the transaction, and that as a matter of fact plaintiffs did not have a complete title to such farm. An abstract was produced at the time, but it did not purport to show conveyances later than March 10, 1883, and upon it, appeared an undischarged mortgage for $2,000.

The title to Mrs. Shaw purported to have been derived through the last will of Garrett Sickles, her father. The will contained no specific description of the land devised. The seventh clause of the will reads as follows:

"*Seventh*. I give and devise to my beloved wife, Elizabeth Sickles, the use, rents, and profits of all the residue of my real estate, situated in the State of Michigan, together with any and all estate, right, and interest in lands which ·I may acquire after the date of this will, for and during her natural life. But on her decease, the remainder thereof I give to my daughter, Elsie Jane Sickles, to have and to hold the said premises to her, the said Elsie Jane Sickles, and to her heirs and assigns forever."

On August 26, 1878, Elizabeth Stebbins conveyed by quitclaim deed to Elsie J. Shaw the following described premises:

"The north part of the west half of the north-east quarter of section twenty-four, also the south part of the east half of the east half of the south-west quarter, and also the south part of the west half of the south-east quarter, of section thirteen,    *    *    *    in town six south, of range twelve west; being all the interest which said Elizabeth Stebbins has to said land by virtue of the will of Garrett Sickles, now deceased."

The deed drawn by Barnard on June 16, and claimed to convey the Shaw farm, contains the following descriptions, viz.:

"All of those certain pieces or parcels of land, situated, lying, and being in the township of Fabius, St. Joseph county, State of Michigan, and described as follows, to wit:

"The small twenty-eight and 23-100 ( 28 and 23-100 ) chains of the east half ( E. $\frac{1}{2}$ ) of the south-west quarter of section number thirteen ( 13 ), hereby conveying a strip of land, 28 and 23-100 chains in width, off from the south end of said east half of the south-west quarter of said section thirteen ( 13 ).

"Also that part of the south-east quarter of section thirteen ( 13 ), commencing at the south-west corner of the south-east quarter aforesaid; thence east twenty-two and 50-100 ( 22 and 50-100 ) chains; thence north twenty-eight and 23-100 ( 28 and 23-100 ) chains; thence west twenty-two and 50-100 ( 22 and 50-100 ) chains, to quarter line; thence south to place of beginning.

71 MICH. 43.

"Also all of that part of the west half ( W. ½ ) of the west half ( W. ½ ) of the north-east quarter of section number twenty-four ( 24 ), commencing at the south-east corner of said west half of west half of said north-east quarter ( ¼ ); thence south twenty-nine ( 29 ) rods; thence west twenty-five ( 25 ) rods; thence north twenty-nine ( 29 ) rods; thence east to place of beginning: All of same above described land being in township number six ( 6 ) south, of range number twelve ( 12 ) west, west meridian, Michigan; containing 124½ acres, be the same more or less."

It is claimed by the defendant that it is apparent from the face of the papers that this deed from Dikeman and Dougherty to defendant embraces land which was a part of the Shaw farm, which is not embraced in the quitclaim deed from Elizabeth Stebbins, formerly Elizabeth Sickles, to her daughter, Mrs. Shaw. It does so appear without question. The land described in the deed to defendant covers more territory than was conveyed by the quitclaim deed to Mrs. Shaw. The quitclaim deed does not purport to convey all the interest the grantor derived from the will to land upon those sections, but only to the land described in the deed. The interest conveyed is restricted to the land conveyed. The court ruled that this was immaterial; that the defendant must rely upon the covenants of warranty in his deed. But I think the defendant had an undoubted right to a good title, and one not clouded or incumbered by the life-interest of Mrs. Stebbins.

In *Allen v. Atkinson,* 21 Mich. 361, this Court held that the vendee had an undoubted right to a good title, and to a deed with proper covenants; and he had a right also to insist that the title should be a marketable one, not open to reasonable objection.

The defendant offered testimony from which, if it had been submitted to the jury under proper instructions,

they might have found that he did not take the deed relying upon the warranty contained therein, but that the title was to be good, and its sufficiency was to be passed upon by his legal adviser after an examination.

The rule of damages is that sanctioned in the case above cited, and in *Pierson v. Spaulding*, 61 Mich. 90 (27 N. W. Rep. 865).

The judgment must be reversed, and a new trial granted.

The other Justices concurred.