(November 2, 1909.)

## TERRENCE FLYNN et al., Respondents, v. THOMAS FLYNN et al., Appellants.

[104 Pac. 1030.]

DELIVERY OF DEED—INTENTION OF PARTIES—CONVERSATION BETWEEN OTHER PARTIES—LISTENER—TESTIMONY OF.

1. The question of whether a deed conveying mining claims has been delivered is one of fact, and depends primarily upon the intention of the grantor.

2. As to what constitutes a sufficient delivery of a deed is largely a matter of intention, and the usual test is: Did the grantor by his acts or words, or both, manifest an intention to make the instrument delivered his deed and thereby devest himself of title?

3. *Held*, under the evidence that there was a delivery of the deed.

4. The testimony of a witness as to the conversation carried on between other persons should be received with great caution, and a person's memory of his own utterances will generally be regarded as more authentic than that of a listener.

(Syllabus by the court.)

APPEAL from the District Court of the First Judicial District, for Shoshone County. Hon. W. W. Woods, Judge.

Action to set aside a deed conveying certain interests in mining claims. Judgment for plaintiff. *Reversed.*

John H. Wourms, for Appellants.

"The real test of delivery is this: 'Did the grantor, by his acts or words, or both, intend to devest himself of title?' If

so, the deed is delivered." (9 Am. & Eng. Ency. of Law, 154; *Doty v. Barker* (Kan.), 97 Pac. 965; *Creveling v. Banta*, 138 Iowa, 47, 115 N. W. 600; *Kneeland v. Cowperthwaite*, 138 Iowa, 193, 115 N. W. 1026.)

"Acts and declarations of the grantor and grantee which, in connection with surrounding circumstances, indicate that the parties intended to deliver the deed, and belief that they had done so, constitute a delivery." (*Hildebrand v. Willig*, 64 N. J. Eq. 249, 53 Atl. 1035.) "The delivery of a deed is complete when the grantor parts with all control and dominion over same, with the intention that the title shall pass to the grantee." (*Biggins v. Lambert*, 213 Ill. 625, 104 Am. St. 238, 73 N. E. 371.) "The rule that the grantor must part with all dominion and control over the deed does not mean that he must put it out of his physical power to procure possession of it." (*Sneathen v. Sneathen*, 104 Mo. 201, 24 Am. St. 326, 16 S. W. 497.)

"If a deed be handed to a third person under such circumstances as to evidence an intention to make a delivery thereof to the grantee named therein, it is immaterial whether there be express directions so to do or not." (*Criswell v. Criswell*, 138 Iowa, 607, 116 N. W. 713; *Gardiner v. Gardiner*, 134 Mich. 90, 95 N. W. 973; *Franklin Ins. Co. v. Feist*, 31 Ind. App. 390, 68 N. E. 188; *Diekman v. Arnold*, 71 Mich. 656, 40 N. W. 42; *Burk v. Sproat*, 96 Mich. 404, 55 N. W. 985; *Coulson v. Coulson*, 180 Mo. 709, 79 S. W. 473; *Martin v. Flaharty*, 13 Mont. 98, 40 Am. St. 415, 32 Pac. 287, 19 L. R. A. 242; *Standiford v. Standiford*, 97 Mo. 231, 10 S. W. 836, 3 L. R. A. 299.)

The fact that the deed remained in the possession of Mr. Norris under the facts of this case until after the grantor's death would not in any manner affect the sufficiency of the delivery of the deed. (*Berry v. Young*, 98 Cal. 446, 35 Am. St. 186, 33 Pac. 338; *Hutton v. Cramer*, 10 Ariz. 110, 85 Pac. 483; *White v. Watts*, 118 Iowa, 549, 92 N. W. 660; *Munro v. Bowles*, 187 Ill. 346, 58 N. E. 331, 54 L. R. A. 865; *Griswold v. Griswold*, 148 Ala. 239, 121 Am. St. 64, 42 So. 554.)

H. E. Worstell, for Respondents.

So long as there is left in the grantor of a deed power, at his discretion, to reclaim, recall, alter or cancel the instrument, it has not been delivered, nor put in a condition such that his failure to exercise this power will give to the acts done the character of a delivery. (*Williams v. Schatz,* 42 Ohio St. 47; *Prutsman v. Baker,* 30 Wis. 644, 11 Am. Rep. 592; *Bettinger v. Van Alstyne,* 29 N. Y. Supp. 904; *Cook v. Brown,* 34 N. H. 460; *Baker v. Haskell,* 47 N. H. 479, 93 Am. Dec. 455; *Porter v. Woodhouse,* 59 Conn. 568, 21 Am. St. 131, 22 Atl. 299, 13 L. R. A. 64; *Hayes v. Boylan,* 141 Ill. 400, 30 N. E. 1041, 33 Am. St. 326; *Commercial Bank v. Reckless,* 5 N. J. Eq. 430, 452; *Schuffert v. Grote,* 88 Mich. 650, 26 Am. St. 316, 50 N. W. 657; *Fitzpatrick v. Brigman,* 130 Ala. 450, 30 So. 500; *Brown v. Brown,* 66 Me. 316; *Alsop v. Swathel,* 7 Conn. 500; *Duer v. James,* 42 Md. 492.)

"The delivery of a deed is complete when the grantor or obligor has parted with his dominion over it, with the intent that it shall pass to the grantee or obligee, provided the latter assents to it, either by himself or his agent." (Greenleaf on Ev., sec. 297; 3 Washburn, 5th ed., "Real Property," pp. 300, 302; *Beardsley v. Hilson,* 94 Ga. 50, 20 S. E. 272; *Moore v. Flynn,* 135 Ill. 74, 25 N. E. 844; *Rittmaster v. Brisbane,* 19 Colo. 371, 35 Pac. 739; *Reel v. Reel,* 59 W. Va. 106, 52 S. E. 1023; *Powell v. Banks,* 146 Mo. 620, 48 S. W. 664; *Stockwell v. Williams,* 68 N. H. 75, 41 Atl. 973.)

In reviewing cases of this sort where there is at best involved little more than a proper conclusion from the evidence presented, the reviewing court will not lightly set aside the decision of the trial judge. (*Spacy v. Ritter,* 214 Ill. 266, 73 N. E. 447.) It is only where it is plainly shown that there is no substantial conflict in the evidence on the material issues, or the trial court has ignored the evidence entirely and rendered judgment without support from the evidence, that this court will interfere and order a new trial. (*Robertson v. Moore,* 10 Ida. 115, 77 Pac. 218; *Abbott v. Reedy,* 9 Ida. 577, 75 Pac. 764; *Thompson v. Wise Boy etc. Co.,* 9 Ida. 363, 74 Pac. 958; *Sabin v. Burk,* 4 Ida. 28, 111, 179, 37 Pac. 352.)

SULLIVAN, C. J.—This is an action brought by Terrence Flynn and others against Thomas Flynn and others, for the purpose of having a certain deed, executed by Charles Flynn in favor of Thomas and William P. Flynn, dated August 24, 1901, conveying to said grantees an undivided interest in seven mining claims situated in Lalande mining district, Shoshone county, Idaho, declared void.

This action was begun by the plaintiffs, who are respondents here, on May 31, 1906, alleging that the grantor was weakened in body and mind to such an extent as to unfit him for the transaction of business at the date of making said deed, and that on account of the weakened condition, the grantor was incompetent to transact any business and was absolutely under the influence and control of the grantee Thomas Flynn, and that the grantees in said deed had fraudulently conspired and planned to procure from the deceased, Charles Flynn, all of his property without paying a fair or adequate consideration therefor, and by divers fraudulent practices had procured from said deceased all of his property except that described in said deed. The value of the property conveyed by said deed is alleged to be $80,000. It is also alleged that the defendant Brady had entered into a contract for the purchase from said grantees of all of the interests conveyed to them by said deed.

The prayer of the complaint is to the effect that said deed be declared null and void and be canceled, and that said grantees be required to convey to the plaintiffs such interests in said mining claims as they may be entitled to receive, and that the grantees be directed to account to the plaintiffs for the rents and profits of said mining claims since August 26, 1901, and that an injunction issue to restrain the defendants from in any manner transferring or encumbering the title to said claims during the pendency of this action.

To this complaint were filed two answers, one by Thomas and William Flynn and one by Patrick Brady, each of which answers put in issue all of the material allegations of the complaint. Thereafter, on February 19, 1907, the plaintiffs filed an amended complaint setting up some additional facts

but still basing the ground for relief on the mental weakness and incompetency of the grantor and the fraudulent practices of the grantees.

The defendants answered said amended complaint, denying both the incompetency of the grantor and the alleged fraudulent practices of the grantees. Thereafter on April 13, 1908, a second amended complaint was filed, alleging the incompetency of the grantor and the fraudulent practices of the grantees, and also the further fact that said deed had never been delivered to the grantees. To this second amended complaint the defendants filed their answers denying the alleged incompetency of the grantor and also denying that he executed said deed under duress or through any fraudulent practices of the grantees.

Upon this second amended complaint the cause was tried by the court. The court found that the grantor was of sound mind and capable of conducting business, and knew the force and effect of his act, and that he ''signed and executed said deed of his own accord and volition,'' and that at the time said Charles Flynn signed and executed the said deed, he was not acting under duress or compulsion of the defendant Thomas Flynn or William P. Flynn or of any other person, and further found that said deed, at the date of the grantor's death, was in the custody of one Edwin L. Norris, Esq., and had never been delivered by the said Charles Flynn, grantor, to the defendants Thomas Flynn or William P. Flynn, the grantees, nor to either of them nor to anyone in their behalf.

Judgment was entered upon those findings in favor of the plaintiffs, adjudging and decreeing said deed of conveyance to be null and void and of no effect, and that the plaintiffs and the defendant Thomas Flynn are decreed and adjudged to be the true and lawful owners of the mining claims described in said deed, in equal proportions of one-fifth each.

A motion for a new trial was made and denied by the court and this appeal is from the judgment and the order denying a new trial.

The only question presented by the appeal is whether or not there was a delivery of said deed by the grantor. It is

contended by counsel for the appellant that there was a delivery of the deed to the grantees, and that the court erred in finding that there was no delivery thereof. All of the evidence bearing upon the question of the delivery of the deed is contained in the record. The deed was prepared by Edwin L. Norris, Esq., who is one of the attorneys for the respondents. He also testified as a witness on behalf of the plaintiffs. He testified that he lived at Dillon, Montana, and was engaged in the practice of law in that town; that he knew Charles Flynn in his lifetime; that he prepared a deed for him—the deed in question. The first evidence introduced on the question of the delivery of said deed was the deposition of said Norris. The testimony in said deposition shows that the witness had a very indistinct recollection in regard to the transaction. As to the execution and delivery of the deed, he testified as follows:

"I will simply state that some of the circumstances I remember distinctly. Some of the circumstances are not so distinct, I am not so positive of them; some few of the circumstances have been called to my mind by conversation of Tom Flynn had a few days ago. . . . . I started to hand the deed to either Charley or Tom, and Tom made some remark to the effect that Charley might want to change it and it had better be left here with Mr. Norris, and that he (Tom) should come back a few days later and get it from me, and to the best of my recollection, refreshened by a conversation had with Tom Flynn a few days ago, I rather think Tom is correct, though I cannot state it to be a positive fact."

He also testified that on the afternoon of the day previous to the execution of the deed, Thomas Flynn informed him that the grantor, Charles Flynn, would be in town the next morning to do some business; that he was not positive that Tom Flynn talked to him about the matter; however, the next morning, August 24, 1901, he remembered that Tom Flynn drove up in front of witness' office with Charles Flynn and assisted him out of the buggy; that said Charles was not strong physically and he (witness) went out and helped him into the office; that he thereafter prepared the deed in ques-

tion and that Charles Flynn signed and acknowledged it in
his presence; that when Thomas Flynn brought Charles to
the office, he went away and came back later for Charles;
that he does not remember whether Tom was in the office
when the deed was signed; that he does remember that Mr.
Melton came in and that there may have been others there;
that he could not remember whether Mr. Cunard was in the
office, but that Tom Flynn had told him that Cunard was
in the office and that Tom was likely correct in regard to the
matter.  As to the data from which he prepared the deed,
he did not know whether he got it from Tom or Charley
Flynn, and testified that ''Very likely I got it from Charley,
but I am not positive.  As to the conversation I had with
Charles, he merely told me whom he desired to make the
grantees and I rather think he gave me the data from which
to prepare the deed, but I do not think he gave me any rea-
son for making the deed.  At least, if he gave me any I can-
not recall them. . . . . Charles was quite weak.  I remember
that he made the remark that he did not think he would live
very long, and I made the remark, 'Oh, Charley, you have a
good while to live.'  However, I did not think so, but I
wanted to jolly him up a little, and he said, 'No, I am not
going to be here very long.'  Judging from the fact that
Charles spoke about his not living very long, that deed might
have been made with that object in view, but I would not
state that as a positive fact, but that occurred to me.  He
lived three days after that.''

''Q.  Where was the deed after they left?''

''A.  I could not state that of my own memory.  A few
days ago Tom Flynn recalled that incident and I have some
memory to that effect.  That after this conversation in which
Charles said that he was not going to live long there was
something said, or I started to hand the deed to either Char-
ley or Tom, and Tom made some remark to the effect that
Charley might want to change it and it had better be left
here with Mr. Norris, and that he should come back a few
days later and get it from me, and to the best of my recollec-
tion, refreshened by a conversation had with Tom Flynn a

few days ago, I rather think that Tom is correct, though I cannot state it to be a positive fact.''

The witness further testified that after the remark about Charley's not going to live long and witness' reply, ''Tom made the remark to the effect that Charley might want to change it or something of that kind. My memory has been refreshed by a conversation with Tom Flynn to that effect and I think he is about right.''

Thomas Flynn, one of the defendants, testified on their behalf that the deceased, Charles Flynn, lived with him for some years before his death; that he had been failing rapidly and a short time before the deed was executed witness lived some distance from Dillon, Montana, and on the morning of the day when the deed was executed, Charles Flynn requested witness to take him to town as he ''desired to fix up his affairs''; that they drove to town and while so driving Charley told witness that he intended to leave his property to him and to his cousin William P. Flynn; that after getting to town, he went to the office of Governor Norris, whereupon he was asked the following question:

''Q. Then what transpired in the office to your knowledge, all of it?''

''A. My brother Charles asked Mr. Cunard if he was crazy or anything of that kind. Mr. Cunard says, 'What makes you ask me that question? You was always a sensible man since I knew you.' 'Well,' he says, 'Terrence Flynn made trouble for all of us brothers heretofore and I don't want him to make trouble any more for my brother and I want you to witness that this deed that I am after making now is all right and I am all right,' Charley says to Mr. Cunard, and Mr. Norris says, 'There is no need of a witness and if there is at any time I will testify you was all right.' So Mr. Norris finished testifying (?) to the deed and handed it to Charley. I believe I was down at the door watching my horses and Charley passed through the office and handed me the deed and says, 'Read that, Tom, and send it to William Flynn at Wallace for to have it placed on the record.' I says, 'No, Charley, I will not send it out of the county

while you are alive. I will leave it here with Mr. Norris. If you get well, you can take care of it; if you die, I will take care of it.' That was all. Mr. Norris told him then he would be good for a good many years yet. He says, 'No, Mr. Norris, it is not a question of many months or years; it is a question of days, not of months or years, and I have no further use for that property.' That was the last words he said in Mr. Norris' office."

"Q. Do I understand the deed got into your hands?"

"A. He walked down and handed it to me and told me to read it."

"Q. Was it Norris that handed you the deed?"

"A. No, sir, it was my brother, Charles Flynn, handed it to me."

"Q. Who was it handed the deed to Norris?"

"A. I walked up and handed it to Mr. Norris for safekeeping, and told him if Charley got well he could get it; if not, I would take care of it. The deed remained with Governor Norris and my brother died within three days afterward, and a few days after his death I went to Governor Norris' office and got the deed and have retained it ever since."

One of the plaintiffs, Terrence Flynn, testified in behalf of the plaintiffs to the effect that he was present during the time that Governor Norris was giving his deposition at Dillon; that his brother Tom Flynn was in the room and when the governor was testifying in connection with the execution of the deed and the circumstances attendant upon its delivery and its retention by Governor Norris, Tom nodded his head in approval.

Mr. Caffee testified on behalf of the plaintiffs to the effect that he was a stenographer and was in Mr. Norris' office at Dillon about four days before the governor's deposition was taken in this case, and heard Tom Flynn's statement with reference to the deed executed by Charles Flynn on August 24, 1901. He testified as follows:

"About four days before the 11th of March, when the deposition was taken, Mr. Flynn came to Mr. Norris' office

where I was working as a stenographer, but I was not working then; I was sitting at my typewriter desk doing nothing, and Mr. Flynn came in and asked Mr. Norris if he would appear when these depositions were taken on the 11th without being subpoenaed, and I am going on the stand and tell what I know and Mr. Norris said, 'Yes, I will be there anyway about this.' Mr. Tom Flynn went on and talked some about the case in the way of trying to refresh Mr. Norris' memory of what occurred when that deed in question was made out. . . . . He said, 'You remember I came in here with Charles,' and Mr. Norris said, 'Yes, you brought Charles here in a buggy, and it was just a few days before Charles died. I think it was on Saturday,' and Tom said, 'Yes, it was on Saturday and Charles died on Tuesday.' And Tom asked Mr. Norris if he remembered about Finlay Cunard being in the office at that time, as he might have been wanted for a witness, and Mr. Norris said, 'No, I have no recollection of Cunard's being in the office at that time.' And Tom said to Mr. Norris, 'Yes, he was in here, because Charles asked you at that time if it would be necessary to have a witness to the deed, and you said, "No, I will at all times swear that Charles is all right," ' and Mr. Norris then said, 'No, I don't believe I made that statement about swearing about the deed, but I more than likely said that a witness was unnecessary to the deed,' and then they talked on for a while, and presently Tom asked Mr. Norris, he says, 'Do you remember, Mr. Norris, after he signed the deed of asking Charles, "What shall I do with this deed?" and started to hand the deed to me, and Charley said, "Give it to Tom," and then Tom said, "No, Charles, let Mr. Norris keep the deed here because you might want to come and change it, so just leave it here, and if at any time you want to come and change it you can do so, and Mr. Norris will make any change in it you want him." ' Mr. Norris then said, 'Well, that sounds familiar now that you bring it to my mind. I do remember of starting to hand you the deed and you saying to Charles, "No, let Mr. Norris keep it, because you might want to come down and change it, and you could do so if you leave it with Mr. Norris," ' and

then Tom went on—let me see what was next—Tom said they left then and he said after Charley died he and Billy Flynn came back and got the deed, and Mr. Norris said, 'Yes, I remember after Charles died you came back and got the deed, but I don't remember about Billy Flynn coming in and getting it,' and then they talked on there and repeated a great deal of this, particular stress laid on a few questions. I happened to be studying Cooley on Contracts at that time and I had a conversation with Governor Norris after Tom left that impressed the facts upon my memory.''

On cross-examination the witness testified that after Tom left, Governor Norris and he talked about the statements that Tom had made while there, and thereupon the Governor dictated to said stenographer the substance of the conversation that took place just as the witness had testified to it, and a copy of said conversation as dictated was taken down by the witness Caffee and a copy of it was sent to the attorneys for respondents at Spokane, Washington, and a copy was retained in the office of Norris.

It will be observed from the testimony of this witness that he first testifies that he was doing nothing, sitting at his typewriter desk during the conversation he attempted to narrate, and at the close of his testimony, he testified as follows: ''I happened to be studying Cooley on Contracts at that time.'' It is thus made to appear from his first statement that he was doing nothing but sitting at his typewriter table, and before he closes his testimony he states that at that time he was studying Cooley on Contracts. He, however, may have meant by this that he was studying Cooley on Contracts while in the office of Mr. Norris and not at the time the conversation occurred.

It further appears that at the very time that said conversation took place, Governor Norris was the attorney for the plaintiffs in this action; that the conversation had between him and Tom Flynn, as he understood it, was of importance in this case; that he had his stenographer, Caffee, take it down in shorthand and had a copy of it sent to the attorneys for respondents who lived in Spokane. The conversation

which occurred between Mr. Norris and Tom Flynn was not testified to by the witness Norris in all particulars as was testified to by the witness Caffee. While Caffee says in one breath that he was doing nothing during that conversation, he says in another that he was studying Cooley on Contracts, and if his mind had been thoroughly fixed on Cooley on Contracts, he evidently could not have fully understood much of the conversation that took place between Tom Flynn and Governor Norris.

The foregoing is substantially all of the evidence upon the question of the delivery of said deed.

It will be observed from the foregoing that witness Norris did not go into the details of the conversation had between himself and Tom Flynn as fully as did the witness Caffee, and at the time the deposition of Norris was taken, according to Caffee's testimony, the governor had carefully dictated to him the conversation had between himself and Tom Flynn, which occurred only a few days before the taking of the deposition. The witness Caffee had apparently no particular interest in the matter, and according to his own testimony was sitting at his typewriter doing nothing or studying Cooley on Contracts. The testimony of Norris as to that conversation is not positive, and he certainly ought to have recollected it as well as his stenographer, having dictated the conversation, as he understood it, shortly after it occurred. Norris testified that he remembered that Charles Flynn said to him that he did not think he would live very long, and in reply thereto the witness testified that he remarked, "Oh, Charley, you have a good while to live," though he did not think so but wanted to jolly him up a little. But he said, "No, I am not going to be here very long." This corresponds with the testimony given by Thomas Flynn in regard to that conversation when Norris remarked, "Oh, Charley, you have a good while to live." Flynn testified as follows: "Mr. Norris told him then that he would be good for a good many years yet. He says, 'No, Mr. Norris, it is not a question of many years; it is a question of days, not of months or years, and I have no further use for that property.'"

It clearly appears from all of the testimony that Charles Flynn was thoroughly impressed with the idea that he could live but a very short time, and that he intended to and did execute said deed with the intention of conveying the mining claims therein mentioned to the grantees, and after executing the deed, he delivered it to Thomas Flynn and told him to send it to William Flynn at Wallace and have him file it for record.    Thomas Flynn thereupon received the deed and believing that his brother was a very sick man, thought to encourage him by stating that he would not send it out of his county while Charles lived; that he would leave it with Mr. Norris for safekeeping and that if Charley got well, he would return it to him, if he wanted it; if not, he would have it placed on record.    We think from all of the evidence it was the clear intention of the grantor to deliver said deed and that it was the clear intention of Thomas Flynn to receive it and that it was delivered by Charles Flynn and received by Thomas Flynn.

Referring again to the testimony of Caffee and his testimony as to the conversation that occurred between Mr. Norris and Thomas Flynn a few days prior to the time the deposition was taken, it will be observed that that conversation was in regard to acts and facts that had occurred long prior to the date of the conversation and that the witness Caffee was sitting at his typewriter doing nothing, as he states in one place, or studying Cooley on Contracts, as he states in another, and perhaps not paying any particular attention to the conversation, and may have remembered said conversation as it was dictated to him by Governor Norris.    The record shows that Norris and Flynn, who had the conversation, substantially agree as to what was said and that the witness Caffee makes some of the statements against Flynn stronger than does Norris.    The witness Norris repeated time and again that he thought ''Tom was correct.''

It is a common experience among those dealing with human testimony that conversations are very imperfectly remembered, particularly when the exact language used is sought to be recalled or where the words spoken were of indifferent

interest to the hearer, and for that reason, among others, the testimony of a witness as to the conversation carried on between other persons is received with great caution, and a person's memory of his own utterances will be regarded as more authentic than that of a listener. It is clear from the evidence that Charles Flynn's intention was to place his property in such shape that Terrence Flynn could give the brothers no trouble in regard to it, and he did so, so far as the interests in the mining claims referred to are concerned, and we conclude from all the evidence that it clearly appears the deed was delivered and accepted.

It is held that the real test of the delivery of a deed is this: Did the grantor by his acts or words, or both, intend to divest himself of title? If so, the deed is delivered. (9 Am. & Eng. Ency. of Law, p. 154.)

In *Doty v. Barker* (Kan.), 97 Pac. 964, the court said:

"What constitutes a sufficient delivery is largely a matter of intention and the usual test is: Did the grantor, by his acts or words, or both, manifest an intention to make the instrument his deed, and thereby divest himself of title?"

It clearly appears from the evidence that Charles Flynn's manifest intention was to deliver said deed to Thomas Flynn and that he did so and that Thomas Flynn accepted it.

In *Creveling v. Banta,* 138 Iowa, 47, 115 N. W. 598, the court said:

"The issue as to whether an instrument has been delivered is one of fact, and primarily dependent on the intention of the grantor."

In *Kneeland v. Cowperthwaite,* 138 Iowa, 193, 115 N. W. 1026, the court said:

"The question of delivery is generally held to be one of intent, and ordinarily, where it appears that the grantor intended to part with the control of the deed and to pass the present title, the delivery is sufficient for that purpose, even though there be no physical delivery of the deed to the grantees."

In *Criswell v. Criswell,* 138 Iowa, 607, 116 N. W. 713, the court said:

"The authorities are in accord that the whole question of the delivery of deeds is one of intent, and that such intent may be gathered from the circumstances surrounding the transaction as well as from direct and positive proof, and we need cite no cases in support of the rule. Since the intent of the grantor is to govern, no particular words or acts are required to constitute a good delivery. If a deed be handed to a third person under such circumstances as to evidence an intention to make a delivery thereof to the grantee named therein, it is immaterial whether there be express directions so to do or not."

See, also, as bearing upon the question involved here, *Gardiner v. Gardiner,* 134 Mich. 90, 95 N. W. 973, and as to whether a deed has been delivered so as to pass title depends upon the intention of the parties, see *Franklin Ins. Co. v. Feist,* 31 Ind. App. 390, 68 N. E. 188; *Dikeman v. Arnold,* 71 Mich. 656, 40 N. W. 42; *Burk v. Sproat,* 96 Mich. 404, 55 N. W. 985; *Coulson v. Coulson,* 180 Mo. 709, 79 S. W. 473; *Sneathen v. Sneathen,* 104 Mo. 201, 24 Am. St. 326, 16 S. W. 497.

Upon the question involved here, the case of *Martin v. Flaharty,* 13 Mont. 98, 40 Am. St. 415, 19 L. R. A. 242, 32 Pac. 287, contains an elaborate discussion as to what constitutes the delivery of a deed. In that case the court has reviewed a great many cases, and it is there held that the question of delivery is one of intention and that the delivery is complete when there is an intention manifested on the part of the grantor to make the instrument his deed. (See, also, *Standiford v. Standiford,* 97 Mo. 231, 10 S. W. 836, 3 L. R. A. 299.)

The fact that the deed remained in the possession of Mr. Norris, under the circumstances of this case, until after the grantor's death does not in any manner affect the sufficiency of the delivery of the deed. (*Bury v. Young,* 98 Cal. 446, 35 Am. St. 186, 33 Pac. 338; *Hutton v. Cramer,* 10 Ariz. 110, 85 Pac. 483; *White v. Watts,* 118 Iowa, 549, 92 N. W. 660; *Munro v. Bowles,* 187 Ill. 346, 58 N. E. 331, 54 L. R. A. 865;

*Griswold v. Griswold,* 148 Ala. 239, 121 Am. St. 64, 42 So. 554.)

In the case at bar, the burden of proof was upon the respondents to show under the facts of the case that there was no delivery of the deed. (*Drees v. Drees* (Iowa), 104 N. W. 479.)

It appears clear to us from the evidence in the case and the law as applied to that evidence that there was a delivery of said deed, and for that reason the judgment of the lower court must be reversed with directions to enter judgment in favor of appellants, and it is so ordered. Costs of this appeal are awarded to the appellants.

Stewart and Ailshie, JJ., concur.


### ON PETITION FOR A REHEARING.

#### (November 26, 1909.)

AILSHIE, J.—A petition for a rehearing has been filed in this case, and it is contended that there is a conflict in the evidence on the question of delivery of the deed involved, and that in deciding the case the court has disregarded the uniform rule of this jurisdiction to the effect that the appellate court will not disturb the judgment where there is a substantial conflict in the evidence.

Counsel misapprehend the purport and intent of the original opinion. We held therein in substance, and do hold, that there is no substantial conflict in the evidence on the question of delivery of the deed. We also hold that, under the law as applied to the facts disclosed by the record, there was a delivery of the deed. The trial court found that the deed was in fact duly and regularly executed on the 24th day of August, 1901, and that the same "was thereupon left in the custody of Edwin Norris, a notary public before whom said instrument was acknowledged, to be held subject to the further control and direction of the grantor." After a careful examination of all the evidence contained in the record, we are fully convinced that the finding of the court to the effect that the deed was delivered to Norris, to be held by the

latter subject to the direction and control of the grantor, is unsupported by the evidence. It is clear to us that the grantor intended to and did part with the deed and all right of control over the same. The deed was delivered to Norris either by the grantor or grantee. On the latter point there is some uncertainty, but as we view the evidence it makes no difference because the intent of the grantor should control in that respect. It was unquestionably intended by the grantor to deliver the deed and part with all control over the same. He had conveyed the property, and expressed a desire to part with its title and further ownership, and on that point there is no conflict in the evidence. It is equally clear that the grantee accepted the conveyance of the property, and the title and ownership thereof.

The thing that injects into the case the controversy and doubt that seem to have arisen grows out of the fact that the grantor, Charles Flynn, was in a dying condition at the time he executed this conveyance, and that his brother, Tom Flynn, realized the situation and was endeavoring to keep his brother, the grantor, cheered up and as buoyant and hopeful as possible. He consequently suggested that the deed be left in the hands of the notary and clearly did this for the purpose of dispelling, if possible, from the mind of the grantor the idea that the grantee really thought the grantor was in so serious and critical a condition as subsequent events demonstrated. The suggestion by the grantee that the deed be left in the hands of Norris was not made because of any hesitancy of the grantee in accepting the conveyance or the title to the property. As we view this evidence, the grantee might have received the deed from Norris at any time subsequent to its execution, and we have no doubt but that Norris would have delivered it to the grantee had he called for it at any time subsequent to its execution, and we think he would have been clearly entitled and authorized to do so. The petition is denied.

Sullivan, C. J., and Stewart, J., concur.