GARDINER *v.* GARDINER.

1. WITNESSES—MATTERS WITHIN KNOWLEDGE OF DECEDENT.
  Complainant in a suit to cancel deeds from herself to her husband, since deceased, cannot testify as to matters equally within the knowledge of the deceased.

2. DEEDS—DELIVERY.
  In determining whether a deed has been delivered, the purpose of the parties in making it is an important factor.

3. SAME—EVIDENCE.
  The testimony of a conveyancer that deeds were signed, acknowledged, and witnessed in his office, and that he does not know who took them from the office, does not show an actual delivery.

4. SAME—RECORDING BY GRANTEE WITHOUT DELIVERY.
  Where a woman executed deeds of her property to her husband, but retained them in her possession, intending to convey the title to him in case she died first, but to hold it if he died first, and the husband, while she was seriously sick, and without her knowledge, took the deeds and had them recorded, the title did not pass, and she was entitled to have them canceled after his death.

Appeal from Ingham; Wiest, J. Submitted June 5, 1903. (Docket No. 154.) Decided July 8, 1903.

Bill by E. Eveline Gardiner against Joseph Gardiner, Sarah H. Adams, Jennie E. Olmstead, and Frederick P. Arthur, administrator of the estate of Nathaniel H. Gardiner, deceased, to set aside certain deeds. From a decree for complainant, defendants appeal. Affirmed.

Complainant and the deceased, Nathaniel H. Gardiner, were husband and wife. They were married June 26, 1859, and had no children. She became the owner of certain real estate purchased with money inherited from her parents. He was also the owner of some real estate. On November 27, 1886, he conveyed by quitclaim deed his

lands to her, which deeds were duly recorded November 30, 1886. On October 29, 1888, she signed and acknowledged two quitclaim deeds to her husband of the lands which he had conveyed to her, and also a warranty deed of her separate lands. These deeds bore date September 13, 1887, and were recorded November 21, 1892. After his death— the date of which is not stated in the record or briefs, but was evidently in the year 1900—complainant filed this bill, the object of which is the annulment of the three deeds from her to her husband. The theory of the bill is that the deeds from her husband to her and from her to her husband were made in accordance with an understanding and for the purpose of securing the title to these lands to the survivor; that they went to a conveyancer, stated their purpose, and that the conveyancer advised them that their purpose could be accomplished by the making of the deeds; and that she was to retain the deeds from her to her husband in her possession, so that, if she died first, he could get them and record them, but that, if he died first, she could destroy them, there having been no delivery by her; that when she was very ill, and in anticipation of her death, her husband took these deeds from her possession without her knowledge, and recorded them; that she some time afterwards ascertained this fact, but that, under the promise and belief that he would some time correct the wrong by proper deeds, she took no steps while he was alive. The case was heard upon pleadings and proofs in open court, and decree rendered for the complainant.

*Lombard & Hext*, for complainant.

*P. Henry Smyth* (*Alfred Allen* and *L. B. McArthur*, of counsel), for defendants.

GRANT, J. (*after stating the facts*). It is conceded that the question is one solely of fact, viz., were these deeds delivered by complainant to her husband? If they were not, she is entitled to the relief prayed for and granted.

No testimony was produced on the part of the defendants, and the question must be determined upon the proofs made by her. It is conceded that her testimony as to the transaction is incompetent under the statute prohibiting her from testifying to matters equally within the knowledge of the deceased, and the court might with propriety, although this is a suit in equity, have refused to receive her testimony. We have not, therefore, read it.

One William C. Saunders was the conveyancer who drew the deeds in question. He testified that complainant and her husband came to him and stated:

"That they had no heirs, and they wished the property to go to the survivor in case of the death of either of them. That seemed to be the object, and to be finally done. They wanted it done, and for that reason I drew up the papers, and talked with them a good deal about some other cases I had had, and like questions coming up. * * *

" Q. I will ask you in what way it was arranged that, by making these deeds from her to him, it could operate so that the survivor could obtain the property.

"A. That was the final object to be attained by making the deeds. They wanted to have the property put in such shape that, if either of them survived the other, the property should go to the survivor.

" Q. How were you going to accomplish that by making these deeds from her to him ?

"A. Well, that would be shown by the papers themselves.

" Q. Perhaps you do not understand what I mean; as to what was to be done with these papers that she was going to make ?

"A. So far as that was concerned, that was a long time ago, and the talk I had at that time completed all I did about the matter.

" Q. Well, I am not asking you what was done with them, but what was your instruction about what should be done with these deeds in order that, in case she should die first, that he would get the property ?

"A. Well, that part don't appear in the writing, does it ?

" Q. Well, I will ask you this,—perhaps you don't understand what I mean: Who was to keep these deeds, if anything was said about it ?

"*A.* Nothing said about it.   *   *   *   The main conversation was to have their property put in such shape to go to the surviving party.   They had no heirs."

This witness knew nothing more about the delivery of these deeds other than that they were signed, acknowledged, and witnessed in his presence; that both were present; and that the deeds were taken from his office, but whether by her or by him he does not know.

One Harry D. Cowan, who lived near Mr. and Mrs. Gardiner, testified:

" *Q.* Did you have any talk with Mr. Gardiner during his lifetime in reference to his property?

"*A.* I did; yes, sir.   The first conversation I had with him was in the summer previous to his death.   It would be the summer of 1899.   I do not know where the conversation took place.   I have had several conversations with him.   I had several conversations with him in presence of the complainant.   They both talked it over with me.   We talked it over several times at their house. We visited back and forth.   Mr. and Mrs. Gardiner carried on a milk business, and I used to go there almost every evening and get milk, and generally would stop and chat a few minutes every time I went over.

" *Q.* State what conversations you had with Mr. Gardiner concerning this property.

"*A.* If I remember correctly, the way the talk concerning this property came around, they had asked me several times if I would draw them up some papers, and I told them I would; and they told me that they owned several pieces of property,—one down in Mason, and a 40 up in Mason county, up near Ludington, and the Grand Rapids property where they lived,—and that he wanted to convey the property over to Mrs. Gardiner.   The first conversation I had, as near as I can recollect, was the latter part of August or first of September, 1899.

" *Q.* I will ask you if, during the conversations you had with them, particularly with him, whether or not he told you anything about how this property came to stand in his name?

"*A.* Yes.

" *Q.* Go on, and state what he said to you about that.

"*A.* Why, he told me the property had formerly all been in her name, but that she had got sick, and thought

she was going to die, and he would go and put the deeds on record. He said he got the deeds from the house where she had them. He said he took them and placed them upon record because she was going to die.

" *Q.* Did he say anything to you whether or not she knew anything about it ?

"*A.* I do not remember whether he said that or whether she said it, but we did talk,—the three of us together.

" *Q.* Was that in his presence whatever was said ?

" *A.* Oh, yes.

" *Q.* And was anything said at that time as to when she found it out ?

"*A.* She said she did not find it out until some little time after,—until she got better.

" *Q.* Did he make any objections to that statement, or any reply to it,—deny it in any way ?

"*A.* No. He mentioned several times afterwards after that the same fact.

" *Q.* In these conversations afterwards did he tell you whether she knew he was going to do that ?

"*A.* No; or, yes. He told me that down to the office several times. The last appointment he made with me to draw the deeds he told me about recording the deeds when she did not know it. The deeds which he recorded were delivered to me when I drew the other deeds, for the purpose of furnishing *data* from which to draft the other deeds. I drafted five or six deeds—I forget the number—from him to her.

" *Q.* I call your attention to these three deeds, and ask if these were the ones that were delivered to you from which to draft the deeds you were to make ?

"*A.* I should say so. I finally delivered them either to you or the administrator.

" *Q.* I call your attention to these documents, and will ask you if those are the deeds you drafted for Mr. Gardiner ?

"*A.* Yes, sir. They were dated January, 1900.

" *Q.* Do they have the year in the date ?

"*A.* 1900.

" *Q.* And the month ?

"*A.* January.   *   *   *

" *Q.* What was done, after you drafted those deeds, with reference to having them executed ?

"*A.* I received word one morning that Mr. Gardiner was sick, and wanted to see me. In the morning I went

over there. I found, I think, he was in bed. I do not think he had gotten up yet. He told me he wanted me to draw those deeds up that he had spoken to me about before, and when I came up from the office to bring them over, and he wanted to sign them. That was the day before he died. In the evening I went home, and got my wife, and went over, and he was asleep. Mrs. Gardiner said to me, 'Now, I do not think—he has been kind of restless all day—I do not think you had better wake him.' She says, 'Cannot you put this off until morning?' I said, 'Yes, if you want to.' Anyway, we agreed to postpone it until morning,—the signing of the deeds. And I went again in the morning, and he was asleep. I came again at noon, and he was dead. I had the deeds with me on each of these visits. They carried on a milk business. She was really the manager of the business. Mr. Gardiner drove the wagon, and she attended to the house business."

On cross-examination he testified:

"He said he went and took them from where she had them, and had them registered. * * * He said it was really her property. * * * She stated in the presence of her husband [and the witness] that he took the deeds when she was sick, and put them on record, and that she did not know anything about it until after she got better; and he did not deny the statement."

It appears from the testimony of one other witness that Mr. Gardiner, in the early summer of 1899, wanted to fix the property so that it would go to the survivor, and asked how it could be done.

It is contended by counsel for defendants that the testimony of the conveyancer, Saunders, shows an actual delivery of the deeds. We cannot concur in this view. Deeds are often drawn, signed, acknowledged, and witnessed, and taken away from the office of the conveyancer, without delivery. The statement "Signed, sealed, and delivered in the presence of," above the signatures of the witnesses, does not necessarily imply an actual delivery. Delivery takes place when the deed, either actually or constructively by record, is placed beyond the control of the grantor. In determining this question of fact, the purpose of the grantor and grantee in making the deeds is an im-

portant factor. From the testimony of Saunders it conclusively appears that the sole purpose of these deeds was to place this property so that it would go to the survivor. If the deeds were not delivered, and remained in her possession, and he died first, the title remained in her. If she died first, and he recorded the deeds, the title would be good, unless her heirs saw fit to test their validity on the ground of nondelivery. We think a fair inference from all the evidence is that the deeds were retained by her in her possession; that they were not delivered, and were not to be delivered until her death; that he, without her knowledge or consent, took them from her possession when she was seriously ill, and recorded them; and that he intended to correct the wrong by the execution of deeds to her, and thus give her the title upon record, as well as the title in fact.

Decree is affirmed, with costs.

The other Justices concurred.