(November 2, 1911.)

## JAMES D. HUFF et al., Appellants, v. ANTHIA HUFF, Respondent.

[118 Pac. 1080.]

APPEAL — FILING TRANSCRIPT — DIVORCE — PRESUMPTION OF FACTS — COMMON-LAW MARRIAGE—DELIVERY OF DEED—UNDUE INFLUENCE.

(Syllabus by the court.)

1. *Held*, that the transcript on appeal in this case was filed within sixty days after the appeal was perfected, as defined by the rules of this court.

2. Where H. and D. were married in August, 1857, and on April 1, 1871, H. abandons his said wife and thereafter does not live with her or support her, and on March 14, 1880, marries B. and continuously lives with B. as her husband from that time to the time of his death in 1908, and during that time there is born to them as the issue of such marriage six children, and at all times they conduct themselves and hold themselves out as husband and wife, and at the time of such marriage B. had no knowledge that H. had not obtained a divorce from D. and that such marriage was entered into in good faith, and B. believed that H. and herself were legally qualified to make a contract of marriage, and it appears that H. had under consideration and took some steps looking toward securing a divorce from D. before he married B., are matters of sufficient importance and of such a serious character by reason of the issue of said marriage to raise the presumption of fact that a divorce had been obtained by H. from D. prior to the time of his marriage to B.

3. Where H. and B. are married by a minister upon authority of a certificate issued by authority of law, and at the time such ceremony is performed H. has a wife still living from whom he had not been divorced, and the first wife died about a year and seven months after said marriage ceremony between H. and B. was performed, and after said death H. and B. continued to live together as husband and wife for a period of twenty-eight years, and there was born to them six children, and they conducted themselves as husband and wife and sustained toward each other every natural association and relation consistent with married life, a marriage will be presumed to have occurred after the removal of the legal impediment by the death of the former wife.

4. Where it is shown that a married man is desirous of giving to his wife the property they have accumulated during their marital relation, and in order to carry out such purpose makes a conveyance of said property to a third party, who conveys to the wife, and it appears that such deeds of conveyance are intended as the deeds of the grantor, and both deeds are duly executed and delivered to the wife, who receives and accepts the same and records the same, there is a sufficient delivery of said deeds and the title to the property passes to the grantee.

5. Evidence in this case examined and *held* not to be sufficient to show undue influence of the wife over the husband or fraud in inducing the execution and delivery of a deed of conveyance of real property from the husband to the wife.

APPEAL from the District Court of the Second Judicial District for Idaho County. Hon. E. C. Steele, Judge.

Action to set aside deeds of conveyance of real property. Judgment for defendant. Plaintiff appeals. *Affirmed.*

L. Vineyard, for Appellants.

If there was no marriage subsequent to the death of the first wife contracted between Huff and the defendant, but they continued to live in a meretricious relation down to Huff's death, this relation did not make them husband and wife. (Stewart on Marriage and Divorce, sec. 46; Keeser on Marriage and Divorce, sec. 45; *Collins v. Voorhees,* 47 N. J. Eq. 555, 22 Atl. 1054, 14 L. R. A. 364.)

"A man, being already married, marries another woman; his marriage is invalid to all intents and purposes without any decree, whether in a proceeding between the parties to settle the question, or in a proceeding after his death in which his issue claim as legitimate." (Stewart on M. & D., sec. 50, and authorities cited; *Patterson v. Gaines,* 6 How (U. S.) 550, 12 L. ed. 553; *Smart v. Whaley,* 6 Smedes & M. (Miss.) 308; *Fornshill v. Murray,* 1 Bland (Md.), 479, 18 Am. Dec. 344; *Higgins v. Breen,* 9 Mo. 497.)

C. T. McDonald, and Jas. DeHaven, for Respondent.

When a marriage has been shown, the law raises a strong presumption in favor of its legality. (*Pittinger v. Pittinger,*

28 Colo. 308, 89 Am. St. 193, 64 Pac. 195, and cases cited; 26 Cyc. 880; Keezer, Marriage & Divorce, secs. 44, 54; *Megginson v. Megginson,* 21 Or. 387, 28 Pac. 388, 14 L. R. A. 540; *Boulden v. McIntire,* 119 Ind. 574, 12 Am. St. 453, 21 N. E. 445; *Hadley v. Rash,* 21 Mont. 170, 69 Am. St. 649, 53 Pac. 312.)

There was clearly a common-law marriage between the deceased and respondent, which took place immediately after the death of the first wife, Abigail Jane. From that time on, even if no divorce had been previously obtained, there was no impediment to Huff's second marriage, and the strong and conclusive presumption from the acts and conduct of the parties, from their holding each other out as husband and wife, and from their mutual assumption of marital rights, duties and obligations, is that the mutual consent, which gives validity to marriage, existed and continued during all the years up to the time of the death of Martin V. Huff. (*Teter v. Teter,* 101 Ind. 129, 51 Am. Rep. 742; 26 Cyc. 894, notes 7, 8; *Schuchart v. Schuchart,* 61 Kan. 597, 78 Am. St. 342, 60 Pac. 311, 50 L. R. A. 180; *Poole v. People,* 24 Colo. 510, 65 Am. St. 245, 52 Pac. 1025; *Barker v. Valentine,* 125 Mich. 336, 84 Am. St. 578, 84 N. W. 297, 51 L. R. A. 787; *Manning v. Spurck,* 199 Ill. 447, 65 N. E. 342; *Blanchard v. Lambert,* 43 Iowa, 228, 22 Am. Rep. 245; *Eaton v. Eaton,* 66 Neb. 676, 92 N. W. 995, 60 L. R. A. 605; *Adger v. Ackerman,* 115 Fed. 124, 52 C. C. A. 568.)

Under the laws of Indiana, where they were living at the time the first wife died, they became husband and wife immediately after that event. Common-law marriages are valid in that state. (*Teter v. Teter, supra.*)

Common-law marriages are recognized in Missouri where the parties lived for about eighteen years. (*Bishop v. Brittain Inv. Co.,* 229 Mo. 699, 128 S. W. 668.) And in this state, where the spouses resided as husband and wife for about six years. (Rev. Codes, secs. 2611, 2620.)

"All marriages contracted out of this state which would be valid by the laws of the country in which they were con-

tracted are valid in this state.'' (*Ibid.*, sec. 2619; *Hilton v. Stewart,* 15 Ida. 150, 128 Am. St. 48, 96 Pac. 579.)

Delivery does not consist in the manual act alone. It is usually a question of intent.

The test is: ''Did the grantor by his acts or words, or both, manifest an intention to make the instrument delivered his deed and thereby divest himself of title?'' (*Flynn v. Flynn,* 17 Ida. 147, 104 Pac. 1030; *Bowers v. Cottrell,* 15 Ida. 221, 96 Pac. 936.)

STEWART, C. J.—This is an action to set aside two deeds of conveyance of certain real estate situated in Idaho county, this state. The first is a conveyance made by Martin V. Huff and Anthia Huff to A. C. Gentry, dated May 2, 1907, and the other, made by A. C. Gentry and Naomi L. Gentry, his wife, to the respondent, Anthia Huff, also dated May 2, 1907.

The cause was tried by the court and findings and conclusions were made and a decree rendered in favor of the respondent. A motion for a new trial was made and overruled and this appeal is from the judgment.

The respondent moves to dismiss this appeal upon two grounds: First, that the transcript was not filed until more than sixty days after the appeal from the judgment was perfected; and, second, because the transcript is not printed according to the requirements of Rule 13 of the rules of this court, as the type used is smaller than the pica designated as the smallest type that can be used in the printing of transcripts. This motion is overruled. The transcript was filed within the sixty days prescribed by the rules of this court, and as the type used in the printing of the transcript, while smaller than that commonly used, is leaded and the lines are not printed as closely together as is usual in such cases, the objection is not well taken.

The trial court made certain findings of facts, which as to the material issues of the case, were as follows:

1. That the plaintiffs are children and heirs at law of the late Martin V. Huff, deceased, and that said Martin V. Huff died September 30, 1908, in Idaho county, Idaho, in the

seventy-second year of his life, and that at the time of his decease he was a resident of said county; that at the time of his death Martin V. Huff and the defendant were living together as husband and wife, and had been so living together since March 14, 1880; that on the 14th day of March, 1880, Martin V. Huff was not undivorced from his former wife, Abigail Jane Huff; that Abigail Jane Huff died in the state of Iowa, on the 6th day of October, 1881, and that Martin V. Huff left his first wife, Abigail Jane Huff, and her children on or about April 1, 1871.

2. That on the first day of April, 1871, the said Martin V. Huff was not possessed of considerable property or any property, either real or personal.

3. That the said Martin V. Huff was divorced from his former wife, Abigail Jane Huff, prior to his marriage to the defendant, Anthia Huff, on March 14, 1880.

4. That the desertion or abandonment of the plaintiffs and their mother, Abigail Jane Huff, by Martin V. Huff, was not due to the wiles or blandishments of the defendant, and that the defendant did not alienate the affections of Martin V. Huff from Abigail Jane Huff, the plaintiffs' mother.

5. That the defendant is a woman of strong will-power and of strong mind, but that she did not at any time exercise any undue influence over the deceased, Martin V. Huff; that at the time of said Martin V. Huff's death he was not the owner of the property in controversy in this case.

6. That at the time of the death of Martin V. Huff, he was not possessed and was not the owner of any personal property or of the personal property described in the complaint.

7. That at the time of the marriage of the said Martin V. Huff and the said defendant, a divorce had been obtained from the said Abigail Jane Huff.

8. That for more than two years before the death of said Martin V. Huff, he was an invalid, suffering from a stroke of paralysis, but that during said time he was not incapacitated on account of weakness of his mind or body or from any

other cause from attending to his business affairs, and that he did attend to his business affairs during all of said time.

9. That the defendant, Anthia Huff, did not on the 2d day of May, 1908, or at any other time, conspire or confederate with her children or any person or persons to overreach the said Martin V. Huff for the purpose of causing him, or making him, sign deeds to any of the real estate or property for the purpose of inducing him to convey the same or any part thereof to whom she chose, or to any person, with the intent to defraud, cheat or overreach, or to disinherit plaintiffs, or either of them, out of their interest in the estate of said Martin V. Huff, or out of any interest in the real property described in plaintiffs' complaint, or any property, or with the intent to cheat, or defraud, or overreach, or disinherit plaintiffs, or either of them, or at all.

10. That on or about May 2, 1908, the defendant, Anthia Huff, at the request of Martin V. Huff, her husband, caused one A. C. Gentry, and his wife, and one J. M. Wolbert, a notary public, to come to the residence of said Martin V. Huff and defendant, for the purpose of conveying the lands described in plaintiffs' complaint from said Martin V. Huff, through the intervention of said A. C. Gentry as trustee, to defendant; that the said J. M. Wolbert did then and there draw a deed conveying the said lands from said Martin V. Huff and defendant to said A. C. Gentry; that the said Martin V. Huff signed the same by mark duly witnessed by two witnesses, and acknowledged the same before said J. M. Wolbert, a notary public, and the said Anthia Huff signed and acknowledged the said deed before the said J. M. Wolbert; that the said Wolbert then prepared a second deed from said A. C. Gentry and wife to defendant; that said A. C. Gentry and wife then and there signed and acknowledged the same before said J. M. Wolbert, and that the said Martin V. Huff then and there caused both of said deeds to be delivered to the defendant; that said Martin V. Huff signed, by mark, executed and acknowledged said deed, and caused the said deed from said A. C. Gentry and wife to be executed and acknowledged, and both of said deeds to be delivered to de-

fendant, for the purpose of conveying his interest in the said lands to defendant; that said deeds were signed and acknowledged freely and voluntarily by all the makers and grantors, and was aware of the tenor and effect of said deeds, and each of them.

11. That said deeds, and each of them, were made out, signed, executed and acknowledged at the request, and under the direction of said Martin V. Huff; that no consideration passed for either of said deeds; that the said deed made to said A. C. Gentry was delivered to him, and the said deed made to Anthia Huff was then and there delivered to her; and that neither of said deeds was made at the request or under the direction of the defendant herein.

12. That neither of said deeds was procured in fraud of the rights of plaintiffs, or either of plaintiffs, and both were made with the free and voluntary consent of the said Martin V. Huff, and were not designed in pursuance of any fraudulent scheme, conceived by the defendant to cheat, swindle or defraud plaintiffs, or either of them, out of their right or title to said described lands or premises, or any part thereof.

13. That on the 14th day of March, 1880, the said Martin V. Huff and the defendant, Anthia Huff, were lawfully married in Martin county, Indiana, and from the date of said marriage to the death of Martin V. Huff, September 30, 1908, continued to live together as husband and wife, and to assume toward each other all marital duties, rights and obligations.

14. That at the time of said marriage the said Martin V. Huff had no property.

15. That there are now living of the issue of said marriage six children, and that said Martin V. Huff and defendant accumulated all the property described in plaintiffs' complaint during the continuance of said marriage.

16. That on or about January 22, 1907, the said Martin V. Huff made and published a will in which he devised to the defendant, as trustee for her said six children, all property of which he should die seised, and giving to defendant a life estate therein; that on May 2, 1908, he conveyed and caused to be conveyed to defendant, through the intervention of one

A. C. Gentry, as trustee, all the real property described in plaintiffs' complaint.

17. That said conveyance was intended as a gift from said Martin V. Huff to defendant; that the same was made of his own free will and as his free and voluntary act and deed; that he did not make his said deed under duress or undue influence of this defendant, or any other person or persons.

18. That said conveyance of said real property was made by the said Martin V. Huff for the purpose of avoiding the delay and expense incident to the issuance of letters testamentary, or of administration upon his estate, and to avoid the necessity of having his said will probated.

19. That at the time he made said will, and at the time he made and acknowledged said deed, the said Martin V. Huff was in the full possession of his mental faculties, and was capable of attending to and directing his business affairs.

The principal question presented upon this appeal is: Does the evidence support the findings of the trial court?

It is first contended that the trial court erred in finding that Martin V. Huff was divorced from his former wife, Abigail J. Huff, prior to his marriage to Anthia Huff on March 14, 1880.

It appears from the evidence that Martin V. Huff and Abigail J. Dunning were married August 30, 1857, and that about April 1, 1871, Martin V. Huff abandoned his said wife and never thereafter lived with her or in any way supported her, and on March 14, 1880, married Anthia Barr, the respondent herein, and continuously lived with her as her husband from that time to the time of his death in 1908, and during that time there was born to them as the issue of such marriage six children. Under the facts of this case we think this court is justified and clearly warranted in concluding that the trial court made no mistake in finding that Martin V. Huff and Abigail J. Huff, his wife, were divorced, although there is no direct evidence proving that a divorce was decreed to either Martin V. Huff or Abigail J. Huff. Yet there is evidence in the record which indicates that Martin V. Huff had under consideration and took some steps

looking toward securing a divorce from his wife, Abigail J. Huff. James D. Huff, one of the plaintiffs herein, and a son of Martin V. Huff, testifies: "I heard from my father in 1878 or 1879 by letter. He wanted a divorce from my mother and asked me to give him an affidavit to assist him to do so. I refused to do it." This witness further testifies that after his mother's death he went to Missouri to work and farm for his father, but only lived with him about two months, during which time he asked his father the following question: "Father, what did you ever do about the divorce business you wrote me about?" To which the father made reply, "Oh, hell! When I come to find out I didn't need any divorce." This is all of the evidence in the record that refers to a divorce. This evidence, while it does not in any way establish the fact that Martin V. Huff applied for or secured a divorce from Abigail J., yet it does indicate that Huff had under consideration the bringing of a suit of that kind, and taken in consideration with the fact that thereafter he entered into a marriage contract with the respondent, Anthia Huff, and for twenty-eight years or more after such marriage lived with her as her husband, and that there were born to them six children, and that at all times they conducted themselves and held themselves out as husband and wife, and that at the time such marriage took place the respondent, Anthia Huff, had no knowledge that Martin V. Huff had not obtained a divorce from Abigail J., and she entered into such marriage in good faith, believing Martin V. Huff and herself to be legally qualified to make the contract of marriage, are matters of sufficient importance and of such a serious character by reason of the issue of said marriage to raise the presumption of fact that a divorce had been obtained by Martin V. Huff prior to the time he married the respondent herein. This presumption upon which the trial court was fully authorized to act represents a principle of law which has been fully approved by the authorities and is fully warranted by principle as well as good morals and common decency.

In discussing this question the supreme court of Colorado in the case of *Pittinger v. Pittinger,* 28 Colo. 308, 89 Am. St. 193, 64 Pac. 195, says:

"No man is presumed to do an unlawful act. When a marriage has been shown, the law raises a strong presumption in favor of its legality. By some of the authorities this presumption is said to be one of the strongest known to the law. Its strength increases with the lapse of time. This presumption arises because the law presumes morality and not immorality, and that every intendment is in favor of matrimony. . . . . This presumption applies with peculiar force in favor of one who is unable to prove affirmatively that the man with whom she entered into the marriage relation in good faith was divorced from a former wife. Appellee was not acquainted with deceased until she met him in Colorado, and, except for the presumption in favor of her innocence, there would be imposed upon her an unreasonable burden if she is required to show that prior to her contracting marriage with the assured he had been divorced. . . . . Considering the strong presumption which the law raises in favor of the innocence of appellee and the validity of her marriage with deceased, in connection with the lapse of time between the date when he separated from his wife in Pennsylvania and married appellee in this state, coupled with the further facts that he left his first wife with the intention of never living with her again, . . . . and that legal divorce proceedings might have been instituted and terminated in his favor without process being received by her, we are of the opinion that this testimony is insufficient to establish that deceased was not divorced from his first wife at the time he contracted marriage with appellee."

In the case of *Megginson v. Megginson*, 21 Or. 387, 28 Pac. 388, 14 L. R. A. 540, the supreme court of Oregon, in discussing this question, says:

"The policy of the law is strongly opposed to regarding a marriage entered into in good faith, believed by one or both of the parties to be legal, followed by cohabitation, as void; and, where the legitimacy of children is called in question, both upon authority and general principles of public policy and natural equity, every reasonable presumption is indulged in favor of legitimacy."

In the case of *Klein v. Laudman,* 29 Mo. 259, the supreme court of Missouri, in discussing this question, holds that "where a woman who entered into a contract of marriage was shown to have had a husband living in Germany prior thereto, the court presumed in favor of the validity of the marriage that the first marriage had been dissolved by divorce." Other cases supporting this doctrine may be found in the annotations in the case of *Megginson v. Megginson, supra,* 14 L. R. A. 540, and in 26 Cyc. 580.

We think, therefore, that in this case the facts fully authorized and fully justified the finding of the trial court to the effect that Martin V. Huff and Abigail J. Huff were divorced prior to the marriage of Martin V. Huff to the respondent, Anthia Huff. It would be sad and unfortunate indeed for this court now to say, under this state of facts, that the marriage relationship which existed to all intents and purposes and as fully and completely as human nature could bring about, was illegal and that the issue of such marriage is illegitimate; that although for thirty years the parties lived together ostensibly as man and wife and conducted themselves toward each other as such, and conducted themselves in the community where they lived as man and wife, and held themselves out as such and were treated as such, and accumulated property under such relationship, yet the law will not presume that they had been legally married.

It is next contended that the trial court erred in finding that Martin V. Huff and Anthia Barr were legally united in marriage on the 14th day of March, 1880. There was read in evidence in this case a certificate issued to Martin V. Huff and Anthia Barr, respondent, authorizing them to be married, and dated March 5, 1880, issued by the clerk of Martin county, Indiana, and it is certified to that they were married under such certificate on the 14th day of March, 1880, by D. Morton, pastor of the M. E. church. Of course, at the time this marriage ceremony was performed, the first wife of Martin V. Huff, to wit, Abigail J., was still living, and if Huff were not divorced from her at that time, this marriage was invalid. Although it may be admitted that this

formal marriage ceremony was void, and that Martin V. Huff and Anthia Huff were incapable of entering into a marriage contract at that time, yet they both recognized their union as husband and wife and entered upon the marriage relation, and children were born to them thereafter, and such relationship continued until Martin V. Huff's death. Clearly, such relations developed into a common-law marriage after the death of Abigail J. Huff, October 6, 1881.

Sec. 2611, Rev. Codes, provides: "Marriage is a personal relation arising out of a civil contract, to which the consent of the parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations."

Marriage as thus defined by the statute certainly has been fully proven and established by the evidence in this case as having been entered into between Martin V. Huff and the respondent, Anthia Huff, and notwithstanding the fact that it may not have been solemnized by a person authorized to administer the marriage ceremony at the time when both parties were capable of making a marriage contract, yet it does appear that thereafter at a time when both parties were capable of making a marriage contract, they mutually assumed marital duties, rights and obligations, and that such duties and obligations continued for a period of twenty-eight years, at least.

Sec. 2620, Rev. Codes, provides: "Marriage must be solemnized, authenticated and recorded as provided in this chapter, but noncompliance with its provisions does not invalidate any lawful marriage." Therefore, if Martin V. Huff and the respondent entered into a marriage by mutual assumption of such rights, duties and obligations, the fact that they did not comply with the provisions of the statute with reference to solemnization, authentication and recording of a marriage certificate, would not render the marriage void. In the case of *Robinson v. Ruprecht,* 191 Ill. 424, 61 N. E. 631, the supreme court of the state of Illinois, in discussing this question, says: "When C. and J. married, they believed

that J. was a widow; but C. knew he had a living wife, who died two years later. They continued to live together as husband and wife for 16 years after the death of C.'s legal wife, and for about a year after the death of J.'s legal husband, when J. died, and C. survived her about a year. Their children, one of which was born before, and two subsequent, to the marriage, were treated and acknowledged by both parents as true and lawfully begotten children, during those years. Deeds were executed to C. and J. as husband and wife. . . . . Held, sufficient to establish a common-law marriage, which is valid in Illinois, and that C.'s children were legitimated and became his legal heirs as provided by Hurd's Rev. St., 1899." (*Blanchard v. Lambert,* 43 Iowa, 228, 22 Am. Rep. 245.)

The court in the latter case, in referring to a Texas case which was approved, says:

"There was no evidence that the first wife of deceased had obtained a divorce prior to her second marriage. But it was held that the law in favor of innocence would raise a presumption that such a divorce had been obtained. That case is, in principle, in all respects like the one at bar. There are other cases which illustrate the force of the presumption of innocence, and show how it overrides opposing presumptions." The court then says:

"Under these circumstances, even if the marriage were originally void, a subsequent marriage will be presumed to have occurred after the removal of all legal impediments by the death of Musgrave in June, 1871. It is a settled rule of the common law that any mutual agreement between the parties to be husband and wife, *in praesenti,* followed by cohabitation, constitutes a valid and binding marriage, if there is no legal disability on the part of either to contract matrimony."

So in the case at bar, even if the marriage of respondent and Martin V. Huff was void at the time of solemnization on the 14th day of March, 1880, because a former wife of Martin V. Huff from whom he had not secured a divorce was then alive, still a marriage will be presumed to have occurred

after the removal of the legal impediment by the death of the former wife, Abigail J. Huff.

Many other cases might be cited in support of this proposition, but we are convinced that both in law and upon principles of morality the marriage of respondent with Martin V. Huff, after the death of his former wife, Abigail J., must be presumed from the facts as they are shown in this case.

Furthermore, the common law was in existence in Indiana with reference to marriages, at the time respondent and Martin V. Huff were living together as husband and wife. (*Teter v. Teter,* 101 Ind. 129, 51 Am. Rep. 724.) And the common law was also recognized in the state of Missouri where the respondent and Martin V. Huff lived as husband and wife for eighteen years. (*Bishop v. Brittain Inv. Co.,* 229 Mo. 699, 128 S. W. 668.) If the marriage of respondent and Martin V. Huff was valid under the laws of Missouri, then such marriage was valid in this state. (Sec. 2619, Rev. Codes.)

It is next contended that the deeds in controversy in this case were never delivered. J. M. Wolbert, the notary who prepared the deeds and before whom the acknowledgments were taken, testified: "I was requested by Mrs. Huff [the respondent] to come to the Huff residence in the month of May, 1907, to draw up some deeds and take acknowledgments of the same. I did so. The deed was made by Martin Van Buren Huff and Anthia Huff, at the request of Anthia Huff, to A. C. Gentry, and then from Gentry and wife to Anthia Huff. These deeds were made under the direction of the defendant. At a previous interview with me the defendant, Anthia Huff, stated that if possible she did not want the deeds to pass into other hands, she said,—simply made and signed and not pass into another's hands. As a notary I explained this could be done, and it was so done. The deed to A. C. Gentry was never delivered to him by Martin V. Huff. It remained in my possession when it was signed on the table, and when the deed from Gentry and wife was signed, I turned them both over to Anthia Huff."

The respondent, among other things, testified as follows: "J. M. Wolbert wrote these deeds at the request of my hus-

band. My husband sent for him to do this. Wolbert got there after dinner. My husband sent me to go to Gentry's and then to go to Cottonwood afterward to get Wolbert to come to our place. . . . . These deeds were carefully read to my husband. I know that. Wolbert got into an argument over his making his mark to the deed, and about the number of witnesses to the deed. His mind was clear mentally. Memory not so good as it had been. My husband first suggested making the deed. Don't know who first suggested making the will. My husband directed the making of the will and the deeds. . . . . He [meaning her husband] said he didn't want his estate to go through probate. I didn't suggest this; he did. He was fully conscious of what he was doing.''

Mrs. A. C. Gentry testified: ''M. V. Huff said he wanted the deed of his land made to us so that it would not have to go through court.''.

A. C. Gentry testified: ''He [Huff] told us he wanted to get his business fixed up—didn't want it to go through court. Saw him make his mark to the deed. He said it should be witnessed by two witnesses, and Wolbert said one witness was enough. He said he would have to watch Wolbert, that he was as crooked as a snake. Deeds were thirty minutes apart.''

It is apparent from this testimony that it was the intention of Martin V. Huff to pass the title to the property described in the conveyances referred to in this action to his wife, and that the method adopted, under the probable suggestion of Wolbert, was that a conveyance be made from the husband and wife to Gentry and then from Gentry and wife to the respondent, as there might be a question as to whether the husband had the power to convey directly to the wife; but there can be no question but that it was the intention of Huff that the deeds executed should pass the title to the wife, and both deeds were delivered to her, and were intended by Huff to make such deeds his deeds, and thereby divest himself of the title to said property and place it in the respondent. We think this was a sufficient conveyance. (*Flynn v. Flynn,*

17 Ida. 147, 104 Pac. 1030; *Bowers v. Cottrell,* 15 Ida. 221, 96 Pac. 936.)

It is also contended that Martin V. Huff was of weak mind, and was unduly and fraudulently influenced to execute the deed to Gentry by the respondent. We have carefully examined all of the evidence in this case, and we are unable to discover any evidence which shows any undue influence, threats or promises exercised or made by the respondent to or over Martin V. Huff, the grantor. It is true there is some evidence given in the case by Manuel A. Huff and James D. Huff with reference to living with and about Martin V. Huff and Anthia Huff, respondent, and that the respondent seemed to boss and run the deceased, and seemed to control their father in his business affairs, and that her word was law in the family, and that she was a very determined woman, and similar expressions. But there are no acts testified to by any of the witnesses which show any undue influence exercised by the respondent over Martin V. Huff, or that any promises were made to him, or any threats made, or any inducement held out, which would lead him to do other than that which he desired to do. It appears from the record that Martin V. Huff made a will prior to the execution of the deeds in controversy in this case, and bequeathed his property to Anthia Huff as trustee for their children, and afterward came to the conclusion that the expenses of probating the will would be a burden upon his estate, and that his wife would be put to unnecessary expense in looking after the settlement of the estate through the courts, and desired to provide a simpler and cheaper method of passing the title from himself to his wife, and for that reason he sent for Wolbert, and the deeds in controversy in this case were executed. There was nothing to indicate that he was in any way influenced by the respondent, or that it was by her solicitation or threats or promises that the deed was executed. It is clear that the act was freely done, and with a desire upon his part to pass the title to his wife. There is absolutely no evidence in the case which in any way shows any undue influence.

We cannot overlook the fact that the evidence in this case shows beyond any question that the property conveyed by the deed of conveyance by Martin V. Huff to Gentry and from Gentry to the respondent embraced property accumulated by the joint efforts of Martin V. Huff and the respondent, Anthia Huff, while they were living together as husband and wife, and that none of such property was the result of the efforts of Martin V. Huff and his former wife, Abigail J. Huff. It, therefore, was community property and belonged to Martin V. Huff and Anthia Huff, and the interest of Martin V. Huff was such that he had absolute power of disposition, other than testamentary, as he had of his separate estate, and he had full power to make a conveyance thereof to such person or persons as he might desire. The plaintiffs never acquired any interest in said property, as the title passed from the father of plaintiffs before the father's death.

It is also contended that Martin V. Huff was weak in mind, but the evidence upon that question shows him perfectly clear in mind. The fact that he desired to change the method by which the title to the property in controversy should be transmitted to his wife by substituting direct conveyances, rather than by will, and the fact that he insisted that two witnesses to his signature at the time of the execution of the deed were necessary, when the notary said that one was sufficient, and the fact that he was capable of transacting his general business in an ordinary and business way, are all clearly shown, and clearly establish his qualification and soundness of mind and clearness in intellect and ability to execute the conveyances in controversy.

The strenuous argument of counsel for appellant has led us to make a thorough and exhaustive examination of the record and a careful examination of the evidence, and we think that the evidence clearly shows that the judgment should be affirmed.

Costs awarded to respondent.

Ailshie and Sullivan, JJ., concur.

Petition for rehearing denied.