**ALBINA ENGINE AND MACHINE WORKS**, an Oregon corporation, and Fireman's Fund Insurance Company, a California corporation, Appellants,

v.

**J. J. O'LEARY**, Deputy Commissioner, Bureau of Employees' Compensation, Department of Labor, and Hilda O'Brien, Appellees.

No. 18545.

United States Court of Appeals
Ninth Circuit.

Feb. 28, 1964.

Gray, Frederickson & Heath, and Lloyd W. Weisensee, Portland, Or., for appellants.

Pozzi, Levin & Wilson, and Philip A. Levin, Portland, Or., for appellee O'Brien.

Sidney I. Lezak, U. S. Atty., William B. Borgeson, Asst. U. S. Atty., Portland, Or., and Charles Donahue, Solicitor of Labor, Alfred H. Myers and George M. Lilly, Attys. U. S. Dept. of Labor, Washington, D. C., for appellee J. J. O'Leary, Deputy Commissioner.

Before MADDEN, Judge of the Court of Claims, and HAMLIN and BROWNING, Circuit Judges.

BROWNING, Circuit Judge.

The sole question on this appeal is whether the District Court erred in sustaining the determination of the Deputy Commissioner that Hilda O'Brien was the "surviving wife" of John C. O'Brien, within the meaning of Section 909 of the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424 (1927), 33 U.S.C.A. §§ 901–950.

The meaning of the statute is, of course, a question of federal law. However, since the statute does not define the term "surviving wife," [1] and since marital status is ordinarily determined by local law, it has been assumed that Congress intended the term to have the meaning which it is given by local law.[2] The parties agree that the law of two states may be pertinent: Oregon, in which injury and death occurred, in which Hilda and John were domiciled at the time of these events, and in which the Deputy Commissioner and the District Court sat; and Idaho, in which Hilda contends she and John contracted a nonceremonial marriage. We think Hilda occupied the required status under the law of either state, and since there was concededly "a conjugal nexus between the claimant and the decedent subsisting at the time of the latter's death * * *," recognition of Hilda's claim is in accordance with the purpose of the federal legislation. Thompson v. Lawson, 347 U.S. 334, 336–337, 74 S.Ct. 555, 98 L.Ed. 733 (1954).

**I**

Under Oregon law Hilda was the "surviving wife" or "widow" of John for the purposes of receiving death benefits under the Longshoremen's and Harbor Workers' Act upon either of two independent grounds.

*First.* The Oregon Workmen's Compensation Act (O.R.S. §§ 656.002–656.-590, 656.990 (1953) grants various benefits to the "wife" or "widow" of a workman, and provides in O.R.S. § 656.226 (1953) as follows:

"*Wife and children of common-law marriage entitled to compensation.* In case an unmarried man and an unmarried woman have cohabited in this state as husband and wife over one year prior to the date of an accidental injury received by such man, and children are living as a result of that relation, the woman and the children are entitled to compensation * * * the same as if the man and woman had been legally married."

The evidence is undisputed that Hilda and John (then unmarried, unless the nonceremonial Idaho union is given effect) lived together in Oregon as husband and wife for many years prior to John's injury, and that a child born in Oregon as a result of that relation was living.

Since Hilda thus would be the "wife" or "widow" of John for the purpose of identifying the recipient of death benefits under the Oregon Workmen's Com-

---

1. The term "widow" is defined in § 902 (16) of the Act as "the decedent's wife living with or dependent for support upon him at the time of his death; or living apart for justifiable cause or by reason of his desertion at such time." To qualify as "surviving wife" under § 909, the claimant must be a "widow" under § 902 (16). Lavino Shipping Co. v. Donovan, 267 F.2d 59, 60 (3d Cir. 1959), and cases cited.

2. Gibson v. Hughes, 192 F.Supp. 564, 566 (S.D.N.Y.1961); Keyway Stevedoring Co. v. Clark, 43 F.2d 983–984 (D.Md.1930).

See also Bolin v. Marshall, 76 F.2d 668 (9th Cir. 1935); Green v. Crowell, 69 F.2d 762 (5th Cir. 1934); Beebe v. Moormack Gulf Lines, Inc., 59 F.2d 319 (5th Cir. 1932). Cf. Ellis v. Henderson, 204 F.2d 173, 175–176 (5th Cir. 1953). The rule is applied under analogous statutes. De Sylva v. Ballentine, 351 U.S. 570, 580, 76 S.Ct. 974, 100 L.Ed. 1415 (1956); Seaboard Air Line Ry. v. Kenney, 240 U.S. 489, 493–494, 36 S.Ct. 458, 60 L.Ed. 762 (1916); Metropolitan Life Ins. Co. v. Chase, 294 F.2d 500 (3d Cir. 1961); Tatum v. Tatum, 241 F.2d 401, 405 (9th Cir. 1957).

pensation Act, she should also be a "wife" or "widow" for the same purpose under the Longshoremen's and Harbor Workers' Act when these terms are defined by reference to the law of Oregon.

It should make no difference if (as has been suggested) the reference in the title to O.R.S. § 656.226 (1953) to a "common-law marriage" is inaccurate, and the statute "does not relate to marriage at all." Million, Consanguinity and Affinity in Oregon, 23 Ore.L.Rev. 69, 90 (1944). Neither the Oregon Workmen's Compensation Act nor the Longshoremen's and Harbor Workers' Act relate to or affect the marriage relationship as such. And the laws of the state regarding marriage are only tangentially relevant as they may bear upon the existence of the status of "wife" or "widow" for the purpose of identifying recipients of benefits under these remedial statutes.

' The application of state domestic relations law, developed in other contexts, to the solution of problems under workmen's compensation statutes, produces results which at best have only a fortuitous relation to the remedial purposes of the compensation acts, and often are in direct conflict with them. When the state law does provide a definition of marital status deliberately shaped to compensation act purposes alone, there is no reason why that definition should not be applied under the federal statute in preference to one drawn from the state's general domestic relations law.

Indeed, this would seem compelled by the rationale of the rule requiring that terms relating to familial relationships be defined by reference to state law. The rule was initially adopted on the ground that to hold otherwise would be to create a set of federal rules in discord with those of the states "on subjects of the most intimate domestic character." Seaboard Air Line Ry. v. Kenney, 240 U.S. 489, 494, 36 S.Ct. 458, 460, 60 L.Ed. 762 (1916). This reasoning requires adoption of the same definitions of marital status the state itself would apply in essentially the same situation.

*Second.* Even if O.R.S. § 656.226 (1953) did not control, Hilda would qualify as John's "surviving wife" or "widow" under the general domestic relations law of Oregon, since Oregon would recognize the nonceremonial marriage of John and Hilda if validly contracted in Idaho.

The courts of Oregon hold that the statutes of that state requiring the formal solemnization of marriage are mandatory, and hence that the marriage relationship is not created in Oregon unless the statutory formalities are complied with.[3] However, it is equally well settled that under Oregon law "[a] relationship recognized as a marriage in another state where it was consummated will be recognized in Oregon even though such a relationship would not be a marriage if the same facts had been relied upon to create a marriage in Oregon." Boykin v. State Industrial Acc. Comm'n, 224 Or. 76, 81–82, 355 P.2d 724, 727 (1960).[4] This, of course, is but an application of the general rule that "a marriage is valid everywhere if the requirements of the marriage law of the state where the contract of marriage takes place are complied with." Restatement, Conflict of Laws § 121 (1934).[5]

Appellants nonetheless resist reference to the law of Idaho on the ground that Oregon will not follow the general rule where its residents enter into a nonceremonial marriage during a visit to anoth-

---

3. Wadsworth v. Brigham, 125 Or. 428, 259 P. 299 (1927), aff'd 266 P. 875 (1928); Huard v. McTeigh, 113 Or. 279, 232 P. 658, 39 A.L.R. 528 (1925), Note, 4 Ore.L.Rev. 308 (1925). See also Bolin v. Marshall, 76 F.2d 668 (9th Cir. 1935); Boykin v. State Industrial Acc. Comm'n, 224 Or. 76, 355 P.2d 724 (1960). Compare Travers v. Reinhardt, 205 U.S. 423, 440, 27 S.Ct. 563, 51 L.Ed. 865 (1907).

4. See also Ollschlager's Estate v. Widmer, 55 Or. 145, 105 P. 717 (1909); Sturgis v. Sturgis, 51 Or. 10, 93 P. 696, 15 L.R.A., N.S., 1034 (1908).

5. See also Loughran v. Loughran, 292 U.S. 216, 223 n. 3, 54 S.Ct. 684, 78 L.Ed. 1219 (1934); Madden on Persons and Domestic Relations 75 (1931).

er state. We think this is not an accurate statement of Oregon law, and are satisfied that in the circumstances of this case the Oregon Supreme Court would recognize the nonceremonial marriage of Hilda and John if valid under the law of Idaho.

It is true that the state of domicile may decline to recognize a marriage strongly offensive to its policy, even though valid under the law of the state where the marriage was contracted.[6] But in Oregon, as in most other states, this exception to the general rule "is invoked only in a few situations." Restatement (Second), Conflict of Laws, Tentative Draft No. 4, § 132, comment b (1957).[7]

Thus, in Sturgis v. Sturgis, 51 Or. 10, 93 P. 696, 15 L.R.A.,N.S., 1034 (1908), the Supreme Court of Oregon held that the marriage of a domiciliary ward was valid though the ward contracted the marriage in another state to avoid the disability imposed by the laws of Oregon. The court said, "a marriage valid where solemnized is valid everywhere, not only in other states generally, but in the state of the domicile of the parties, even when they have left their own state to marry elsewhere for the purposes of avoiding the laws of the state of their domicile." The court recognized only two exceptions to this rule, "viz., marriages which are deemed contrary to the law of nature as generally recognized in Christian countries, such as involve polygamy and incest, and marriages which the local lawmaking power has declared shall not be allowed any validity, either in express terms or by necessary implication * * *." 51 Or. at 16, 93 P. at 698. The Oregon Supreme Court reaffirmed the rule of Sturgis in Leefield v. Leefield, 85 Or. 287, 166 P. 953 (1917), sustaining a marriage between first cousins prohibited by Oregon statute, when contracted by Oregon domiciliaries in another state.

The only instances called to our attention in which the Oregon Supreme Court has declined to recognize marriages between its domiciliaries validly contracted in other states involved marriages consummated within six months of an Oregon divorce in the face of an Oregon statute providing that "neither party shall be capable of contracting marriage" during that period. (O.R.S. 107.110). The latter statute is read by the Oregon Supreme Court as providing "that persons under the prohibition of the statute are incapable of entering into the contract of marriage, and, therefore, being unable to contract the marriage, wherever performed, it is void ab initio." Wright v. Kroeger, 219 Or. 102, 105, 345 P.2d 809, 811 (1959).[8] Such marriages thus fall within the second of the two exceptions stated in Sturgis.

Since a nonceremonial marriage does not fall within either of the Sturgis exceptions, it may be anticipated that the Oregon Supreme Court would follow the general rule [9] that such marriages are valid everywhere, including the domicile of the parties, if valid in the state where contracted.

Appellant relies upon language of the Oregon Supreme Court in Huard v. McTeigh, 113 Or. 279, 295–296, 232 P. 658, 663, 39 A.L.R. 528 (1925), characterizing "common-law" marriages as contrary to the public policy of the state. But in Boykin v. State Industrial Acc. Comm'n, 224 Or. 76, 355 P.2d 724 (1960), the court sustained a claim for widow's benefits under the Oregon Workmen's Compensation Act based upon a nonceremonial marriage contracted in Idaho, reversing a decision of the State Industrial Accident Commission which had denied the validity of the marriage. The Oregon Supreme Court did not suggest that state policy created any obstacle to this result. It is true that in Boykin the parties were not domiciled

6. Restatement, Conflict of Laws § 132 (1934).

7. See also Comment, 11 Okla.L.Rev. 305 (1958).

8. See also In re Ott's Estate, 193 Or. 262, 238 P.2d 269 (1951), and cases cited.

9. Restatement, Conflict of Laws § 123 (1934); Madden on Persons and Domestic Relations 76–77 (1931).

in Oregon at the time of the Idaho marriage, but nothing in the opinion indicates that the result would have been different had they been Oregon domiciliaries; and in Ollschlager's Estate v. Widmer, 55 Or. 145, 154–156, 105 P. 717, 720 (1909), the Oregon Supreme Court sustained a marriage of a domiciliary contracted in another state, although assuming that ceremonial requirements had not been met.

Finally, even if O.R.S. § 656.226 is not given the determinative effect we have suggested, it at least establishes beyond question that the public policy of Oregon does not preclude recognition of nonceremonial marriages for the purpose of identifying recipients of death benefits under legislation such as the Longshoremen's and Harbor Workers' Compensation Act, and that the public policy of Oregon would affirmatively favor Hilda's claim in the circumstances of this case.

Since it appears that Oregon would recognize a nonceremonial marriage contracted in Idaho by Hilda and John, if valid under Idaho law, we turn to the latter inquiry.

## II

Idaho recognizes nonceremonial marriages.[10] Under the pertinent Idaho statutes, there are only two requirements for a valid marriage: (1) "consent," and (2) "mutual assumption of marital rights, duties or obligations." Idaho Code § 32–201 (1947).[11] And both "may be manifested in any form." Idaho Code § 32–203 (1947).[12]

Hilda and John lived together as husband and wife continuously from 1938 until John's death in 1961, and were accepted as such by their families and the communities in which they lived. Their relationship began in Idaho, and two of their three children were born there. They moved to Oregon in 1942, where they lived until John's death. Each year from 1942 until John's accident in 1956 they returned to Idaho with their children, and spent a week or two visiting their parents.

John had married one Goldie J. Harper in 1928. Although he separated from Goldie in 1937, before his union with Hilda, the marriage was not formally dissolved until 1943. The existence of this undissolved prior marriage prevented a valid marriage between Hilda and John at the inception of their relationship. However, under Idaho Code § 32–201 (1947) "consent is a continuing thing" (In re Foster, 77 Idaho 26, 32, 287 P.2d 282, 285 (1955),[13] and "although the contract and consent marriage * * * was *absolutely void at the time,* the more reasonable rule seems to be that a continuance of the marital relation and assumption of its duties, after the impediment ceased * * * amounted to a consensual marriage, under the statute, and could not be assailed or avoided." Morrison v. Sunshine Mining Co., 64 Idaho 6, 12, 127 P.2d 766, 769 (1942).[14]

Accordingly, the Deputy Commissioner found that Hilda and John "entered *into a common-law relationship*" in Ida-

---

10. The leading Idaho decision is Huff v. Huff, 20 Idaho 450, 118 P. 1080 (1911). The Idaho authorities are reviewed in Boykin v. State Industrial Acc. Comm'n, 224 Or. 76, 355 P.2d 724 (1960).

11. Idaho Code § 32–201 (1947) provides: "Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by a mutual assumption of marital rights, duties or obligations."

12. Idaho Code § 32–203 (1947) provides: "Consent to and subsequent consummation of marriage may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases."

13. See also Boykin v. State Industrial Acc. Comm'n, 224 Or. 76, 85, 355 P.2d 724, 728 (1960).

14. Thomey v. Thomey, 67 Idaho 393, 397–398, 181 P.2d 777, 779 (1947); Nicholas v. Idaho Power Co., 63 Idaho 675, 680–681, 125 P.2d 321, 323–324 (1942); Huff v. Huff, 20 Idaho 450, 460–461, 118 P. 1080, 1083 (1911).

ho in 1938, and "that the annual visits of the deceased and the claimant to Idaho after the dissolution of the marriage of the deceased on April 10, 1943, were sufficient to create or confirm the marital relationship which existed between the deceased and the claimant from 1938 until his death in 1961 * * *."

In attacking this conclusion, appellants argue (1) that Hilda and John could not contract a nonceremonial marriage during visits to Idaho while domiciled in Oregon, and (2) that even assuming that Idaho law would permit such a marriage, it would not do so without proof of an explicit agreement in Idaho during the visits.

(1) There is no apparent reason why Idaho should object to a marriage of non-domiciliaries visiting in the state, so long as they comply with Idaho law, and Idaho Code § 32–201 (1947) draws no distinction between residents and nonresidents.[15] Moreover, John and Hilda's connection with Idaho was not that of mere visitors. As we have noted, their relationship began there; they lived in Idaho as man and wife from 1938 to 1942; two of their three children were born in Idaho; and both John and Hilda had parents in Idaho whom they visited annually, as husband and wife, accompanied by their children.

The Idaho Supreme Court has repeatedly affirmed that "[t]he rule adopted in this jurisdiction is that * * * every intendment of the law leans to matrimony" (Mauldin v. Sunshine Mining Co.,

61 Idaho 9, 17, 97 P.2d 608, 611 (1939)),[16] and it borders on the frivolous to suggest that the conduct of John and Hilda in Idaho, even if confined to the period after 1943, did not show consent to marriage and mutual assumption of marital duties, thus satisfying the requirements of Idaho Code § 32–201 (1947).

(2) It is true that some jurisdictions appear to follow a rule that to establish a valid marriage after the removal of a legal impediment there must be some evidence of a new marriage agreement in addition to mere continuation of the prior relationship.[17] But the Supreme Court of Idaho has expressly rejected this requirement in cases involving Idaho domiciliaries, and nothing in those decisions or in the Idaho statutes suggests that a different rule will be applied to non-domiciliaries. All that Idaho law demands is a continuation, following removal of the impediment, of conduct sufficient to constitute a manifestation "in any form" of the "consent" and "mutual assumption of marital rights, duties or obligations," required by Idaho Code § 32–201 (1947).[18]

We note that the record contains a letter opinion addressed to the Deputy Commissioner by the Attorney General of Idaho stating that under Idaho law "the appearance of the parties in Idaho as husband and wife after the impediment to the marriage was removed would be sufficient to create the marital relationship or confirm it."

Affirmed.

15. Cf. Taintor, Marriage in the Conflict of Laws, 9 Vand.L.Rev. 607, 620–21 (1956).

16. See also Thomey v. Thomey, 67 Idaho 393, 397, 181 P.2d 777, 779 (1947); Nicholas v. Idaho Power Co., 63 Idaho 675, 681–682, 125 P.2d 321, 324, and cases cited.

17. See, e. g., Tatum v. Tatum, 241 F.2d 401, 409–410 (9th Cir. 1957); In re Binger's Estate, 158 Neb. 444, 63 N.W.2d 784, 788–789 (1954); Madden on Persons and Domestic Relations 73–75 (1931).

18. See notes 11, 12, supra; Thomey v. Thomey, 67 Idaho 393, 396–398, 181 P. 2d 777, 778–779 (1947). See also Warner v. Warner, 76 Idaho 399, 405, 283 P.2d 931, 934 (1955); Morrison v. Sunshine Mining Co., 64 Idaho 6, 12, 127 P.2d 766, 769 (1942); Nicholas v. Idaho Power Co., 63 Idaho 675, 680, 125 P.2d 321, 323 (1942); Huff v. Huff, 20 Idaho 450, 460–463, 118 P. 1080, 1083–1084 (1911).